The contract of April 15, 1912, has this provision:

"And, in the event that the said Magill, trustee, shall fail to make the balance of the payments as above provided, this contract shall become null and void and of no further force and effect, and' said Magill, trustee, shall forfeit all rights hereto in land and royalty."

It is evident from the four instruments in writing that there was an implied obligation on the part of Magill, trustee, to actively cooperate with the original owners of the land in accomplishing their purpose to have the land developed for oil. The owner of the land, so long as these contracts were apparently valid and on record, could not without this co-operation accomplish this purpose thus originally evidenced and never abandoned so far as the record shows until these instruments had been canceled and the rights of Magill, trustee, thereunder annulled, since the record of the instruments constituted a cloud upon the title of the present owner of the land. Had Magill, as trustee, paid or offered to pay the contract price for the rights he would have acquired had the price been paid, he would be entitled as such trustee to a specific performance by the owners of the land. Had Magill, as trustee, pleaded and proved that he had offered to co-operate with the owners of the land in carrying out their purpose evidenced by the contracts to develop the land for oil in a reasonable way and within a reasonable time after the land had ceased to produce oil under the Cherry lease, he would have been entitled to have deferred further payments of the purchase money for a reasonable time. We assume that he neither pleaded nor attempted to prove anything of the kind, but rested his claim to have the prayer of the appellees denied upon the idea that the balance of the purchase money should never be paid unless perchance that some time in the future oil therefrom should be produced in sufficient quantities and of such value as to entitle the owners of the land to the remainder of the purchase money paid in $1,000 lots.

In the absence of stipulation as to time for the performance of the terms of a contract, the law allows a reasonable time. This is a question of fact to be determined by the circumstances and the evidence surrounding the situation of the parties and subject-matter under which the contract was executed.

This being a suit to enforce the performance of a contract according to its terms, and it having been seen that one of the terms of the contract is that it should become void in the event the balance of the payments should not be made, and it further appearing that said balance was not paid, it follows that all rights to the land and royalty have been forfeited by the appellants.

[8, 9] We therefore recommend that the following question be answered in the affirmative:

"Were the appellants obligated to pay the remaining $8,000, balance of the agreed purchase money, for the land within a reasonable time after the date of the second contract, despite the fact that the production of oil therefrom had ceased during 1913?"

And we recommend that the remainder of the question certified be answered in the negative:

"Was such balance only required to be paid by them as and when oil might be produced from the land at any time subsequent to April 15, 1912?"

CURETON, C. J. The opinion of the Commission of Appeals answering certified questions is adopted and ordered certified.

---

## HOUSLEY v. STRAWN MERCHANDISE CO. et al. (No. 882—4032.)

(Commission of Appeals of Texas, Section A. Feb. 23, 1927.)

1. **Frauds, statute of** ⬤⟲23(1)—**To take oral promise to pay another's debt out of statute of frauds, promise must create obligation which is original undertaking.**

To take oral promise to pay another's debt out of statute of frauds, character of promise must be such as to create obligation independent of ·obligation of the other party, so as to be original and not collateral undertaking.

2. **Frauds, statute of** ⬤⟲33(1)—**Oral promise to guarantee contractor's account held within statute, regardless of guarantor's purpose to benefit by extension of credit to contractor, "promise to pay another's debt."**

Where plaintiff refused to give contractor credit unless landowner for whom contractor was erecting buildings guaranteed account, oral promise to guarantee account was "promise to pay another's debt" and within statute of frauds, regardless of whether purpose in making it was to gain personal benefit in having buildings completed.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Promise to Pay Debt of Another.]

---

⬤⟲For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

3. Frauds, statute of ☞17—Oral promise to pay another's debt does not create legal obligation (Vernon's Ann. Civ. St. 1925, art. 3995).

Promise to pay debt of another, if not in writing, does not have effect to create legal obligation, under Statute of Frauds (Vernon's Ann. Civ. St. 1925, art. 3995).

4. Frauds, statute of ☞144—Landowner, orally guaranteeing contractor's account, held to commit no fraud precluding him from denying liability under statute (Vernon's Ann. Civ. St. 1925, art. 3995).

Where plaintiff asked landowner to guarantee account of contractor before extending more credit, landowner committed no fraud in orally guaranteeing account, which would preclude him from denying liability under Statute of Frauds (Vernon's Ann. Civ. St. 1925, art. 3995), extension of credit being between plaintiff and contractor, where landowner did nothing to affect plaintiff's action as to securing statutory lien.

5. Evidence ☞318(4)—Evidence based solely on foreman's written reports held inadmissible to show value of materials and labor unless reports were shown to be correctly kept.

Where contractor claimed amount due from landowner due to change in plans, evidence of value of extra material and labor, based solely on foreman's written reports, *held* inadmissible as hearsay, in absence of showing that such reports were correctly kept.

Error to Court of Civil Appeals of Second Supreme Judicial District.

Action by Strawn Merchandise Company against Moore & Co. and another, in which Moore & Co. sought judgment against its codefendant J. H. Housley. Judgments adverse to J. H. Housley were affirmed by the Court of Civil Appeals (253 S. W. 673), and he brings error. Judgment for plaintiff reversed and rendered, and judgment for Moore & Co. reversed and remanded.

P. C. Sanders, of Strawn, and Chandler & Pannill, of Stephenville, for plaintiff in error.

Penix, Miller & Perkins and Ritchie & Ranspot, all of Mineral Wells, for defendants in error.

BISHOP, J. J. H. Housley entered into a written contract with Moore & Co., a firm composed of J. B. Moore, Sr., and J. B. Moore, Jr., for the erection of two buildings on lots belonging to him. By the terms of this contract Moore & Co. were to furnish all materials and perform all labor and complete the buildings according to plans and specifications for a specified amount to be paid by Housley. Moore & Co. purchased materials from Strawn Merchandise Company to be used in the construction of the buildings, the purchase price of which was charged to their account. They failed to pay this account as

they had agreed to do, and prior to the completion of the buildings the merchandise company refused to supply additional materials necessary to the construction thereof.

Mr. Mackey, the general manager of Strawn Merchandise Company, testified to a conversation thereafter had with J. B. Moore, Sr., and Housley as follows:

"As to whether or not I ever refused to furnish Moore & Co. any further material, I will state that the first charge we have against the account is on July 16th. This account was to be paid at the end of every week up as far as 80 per cent. cash. One or two payments were made, and then we didn't get any more payments for about three or four weeks, and I instructed Mr. Naylor not to send out any more material on this job. We refused to deliver Moore & Co. any more material on this job, about the 14th or 15th of September.

"Following that time, I was called on by Mr. Moore and Mr. Housley at the store. I had not delivered a thing from the time I stopped delivery of material on this job until the time Mr. Housley and Mr. Moore called on me. There was an agreement had there at that time between me and Mr. Housley relative to this account. As to what was said there at that time, I will state that on that date, which was September 20th, Mr. Moore came in and told me he was going to give $1,000 on the account at that time; they owed between $2,700 and $2,800; he came in with Mr. Housley, he got a check from Housley for $1,000 on that date, but while we were talking he told me, he says, 'Now, Mackey, I am going to pay you $1,000 on this account, and I would like for you not to bother me any more until the job is completed.' 'Well,' I says, 'that will leave you owing me between $1,700 and $1,800, Mr. Moore, after you pay me the $1,000,' says, 'How much more material will it take to complete the job?' He says, 'It will take $800 or $900 more probably.' He was just guessing at it. 'Well,' I said, 'that would run the account up around $2,700.' I said, 'Mr. Moore, the only way I can agree to let this account run on until the job is completed without any more money on the account is for Mr. Housley to guarantee the account.' I said, 'Mr. Housley, will you do that?' and he said, 'Yes.' He said, 'Mr. Moore has ample coming to him to take care of everything.' I said, 'Very well; I won't bother you any more until the job is completed.' And I didn't. Mr. Moore was eliminated then and there from the transaction. We, however, for the sake of convenience, let the account go on the books just like it was, 'Moore & Co., Housley job.'

"After that I mailed all the statements to Mr. Housley, but made the account out Moore & Co., just like we had always done. I would not have furnished those additional materials except for Mr. Housley's agreement. I would not have furnished Moore any additional materials except for Mr. Housley's agreement.

"I said awhile ago that the terms of payment agreed upon by me and Moore was that he was to pay not less than 80 per cent. of all materials purchased at the end of the week, as he got his money. He didn't do that and that is why we stopped.

"I do not know where Mr. Moore came from

to Strawn. He had not, within my knowledge, any property subject to execution whatever, nor has he now within my knowledge any property subject to execution.

"Following this agreement that I have testified about, I furnished them all the material they called for until it was finished. I did not, after that, make any further demand for payments until the job was finished."

On cross-examination, he testified as follows:

"This conversation was had with Mr. Housley on the 20th day of September of the year of 1919, in our store; not in my office, but in the dry goods department. Mr. Moore and Mr. Housley were present. J. B. Moore, Sr., was present. There are two of them; the old gentleman and the son. I believe Mr. Moore came in the store before Mr. Housley. I did have a conversation with Mr. Moore. He told me he was going to pay me some money on the account. After that conversation Mr. Moore went away and then he came back with Mr. Housley; that is when they came in with the check. Mr. Housley had given Mr. Moore a check for $1,000, and Mr. Moore indorsed that check to the Strawn Merchandise Company.

"At that time I did not specifically ask Mr. Housley the condition of Mr. Moore's account with him. There was no one else present at that time but Mr. Moore and Mr. Housley. I do not remember Mr. Housley remarking that this $1,000 constituted part in advance of what he owed him at that time. I could not say about that.

"I testified that Mr. Moore came and made arrangements with me and purchased a bill when he opened the account; I opened the account with Moore & Co. for the Housley job. I never had any conversation with Mr. Housley in reference to this account until this time. I had made a trade with Mr. Moore to pay me 80 per cent. weekly, and he did that for about two weeks, but he didn't do it any more, and that is why we stopped. This trade was made in July; the first charge against Moore & Co. being made July 16th, and I never had taken it up with Mr. Housley until the 20th of September. I had never mailed Mr. Housley a duplicate invoice before this conversation.

"After Mr. Moore and I had this conversation he went away, and he and Mr. Housley came back together. I think Mr. Housley had the check written when he came in, and it was delivered to me, and this conversation ensued about which I have testified; that Mr. Moore then wanted me to go ahead and furnish material until the job was completed and I said I would not, but I first asked him about how much more material it would take and he told me about $800 or $900 worth, which would run his account up to $2,500 or $2,600. I told him that would run his account up to something like that. It was then that I told him that the only way I would agree to go ahead and sell the material would be for Mr. Housley to guarantee payment of the account. I testified to that awhile ago. I said the entire account. When I say 'account,' I mean the entire account. I testified awhile ago that I told Mr. Moore that I would only sell him the rest of the material provided Mr. Housley would guarantee the account. I meant the entire account;

I mean the entire account now, and I meant it then. I specifically stated the amount of the account before I asked Mr. Housley the question. I asked him how much it would run approximately before I turned to Mr. Housley and asked him if he would guarantee it. I did that on September 20th. I did testify to that awhile ago. I said that Mr. Moore said to me, 'I would like for you to let this run until the job is completed, and not call on me for any more money until then,' and I said, 'Mr. Moore, how much more money will it take?' and he said, 'Some $800 or $900 I judge.' I said, 'That will run the account up to $2,600 or $2,700 before you finish.' I said to Mr. Moore, 'The only way I can do that is for Mr. Housley to guarantee payment of the account,' and I turned to Mr. Housley and I said, 'Will you do that, Mr. Housley?' and he said, 'Yes; I will do it.' He said, 'Mr. Moore has ample coming to him in the contract to take care of everything.' 'Mr. Moore has ample coming to him in the contract to take care of everything.' That is what he said. I remember the conversation as well as if it had taken place yesterday.

"That is the check I have testified about. It is payable to Moore & Co. I did not write that —that is not my handwriting. At that time I did not ask Mr. Housley how much he owed Mr. Moore. I did not ask him how much he was going to pay Mr. Moore altogether, but it was my understanding that he retained 20 per cent. all the way down the line, and for that reason Mr. Moore was to pay me 80 per cent. I continued to carry this account just like we had carried it right along, and said nothing more to Mr. Moore about the account. We rendered statements and mailed them to Mr. Housley. I did not render Moore any statements personally. We figured from then on it was Mr. Housley's account. I figured that if he would guarantee the account he would want to know what was going on."

Strawn Merchandise Company instituted this suit against Moore & Co. and Housley to recover the amount due on this account. Housley answered by general denial and specially pleaded that the promise relied upon by the merchandise company was oral and unenforceable because within the statute of frauds. Moore & Co. in their answer alleged that during the construction of the buildings changes were made in the plans and specifications, which required additional materials and labor furnished and performed by them, for which Housley was indebted to them and for which they sought judgment against Housley.

The case was tried before a jury, resulting in a judgment in favor of the merchandise company against Housley and Moore & Co. for the full amount sued for, and judgment in favor of Moore & Co. against Housley for $694.90 for additional materials and labor not provided for in the plans and specifications made part of the contract between the parties. Housley alone appealed to the Court of Civil Appeals, and that court affirmed the judgment of the trial court, 253 S. W. 673.

The jury in response to one of the special issues found:

"That it was the intention and main purpose of Housley, when he guaranteed the account of Moore & Co. to plaintiff, to subserve his own purpose and interest rather than to discharge and extinguish the liability of Moore & Co."

[1, 2] The Court of Civil Appeals, in affirming the judgment in favor of the merchandise company against Housley, based its holding on the rule referred to in the case of Lemmon v. Box, 20 Tex. 329, as follows:

"* * * Wherever the main purpose and object of the promisor is, not to answer for another, but to subserve some purpose of his own, his promise is not within the statute, although it may be in form a promise to pay the debt of another, and although the performance of it may incidentally have the effect of extinguishing the liability of another. 2 Parsons on Contracts, 305; [Nelson v. Boynton] 3 Metc. [Mass.] 396."

The meaning of this rule is not that ascribed to it by the Court of Civil Appeals. It means that, if the character of the promise is such that it creates an obligation independent of the obligation of the other party, and is therefore an original and not a collateral undertaking, it is not within the contemplation of the statute, even though the promise may be in form one to pay the debt of another. If the promise is, in substance, an undertaking to pay the debt of another, it is within the statute, regardless of the purpose for which it was made. The purpose and object of the promissor means more than the consideration passing to the promisor. It means the character or nature of the undertaking. This is shown by the language of the court in this case, which is:

"* * * The main object of the plaintiff, in accepting the order, was not to discharge the debt which the carpenters owed to the defendant, but to pay his own to the carpenters, in a mode which it may be presumed was the most convenient to him; and his leading object being to subserve his own interest, the acceptance must be regarded as an original, not a collateral undertaking, and therefore not within the purview of the statute; and his acceptance, though by parol, must be held as binding. * * *"

If the object of this promise was to pay the debt of Moore & Co. to the Strawn Merchandise Company, being oral, it is within the statute of frauds, whether the main purpose or motive of Housley was or was not to gain a personal benefit in having his buildings completed. If it was a personal obligation, independent of the obligation or debt of Moore & Co., the benefit to be derived from having the buildings completed would furnish ample consideration to support the verbal agreement, and the agreement would not be within the purview of the statute.

[3] No useful purpose would here be served in discussing the rule, which has been adopted by courts of some other states to determine whether an oral promise to pay the debt of another was within the statute of frauds enacted by those states, termed the "main purpose rule." This rule is not applied in this state. A promise to pay the debt of another, if not in writing, does not have the effect to create a legal obligation.

When the oral promise upon which this suit against Housley is prosecuted was made, Mackey, acting for the Strawn Merchandise Company, and J. B. Moore, Sr., were discussing the payment of the debt, which Moore & Co. owed the merchandise company, and whether further credit should be extended to Moore & Co.. During this discussion Mackey asked Housley if he would guarantee the account. Housley answered that he would. Housley was not asked to make the account his own and to become primarily liable therefor. He was only asked to guarantee the account. The reason that impelled Housley to make this promise is wholly immaterial in so far as the question whether the promise was within the statute of frauds is concerned. The promise is not only in form, but in substance, a promise to pay the debt of others. The agreement, as stated by Mackey, was with reference to the Moore & Co. account. It was not with reference to a debt which Housley then owed, nor did it have any reference to materials which Housley was to thereafter purchase. The agreement shows that the debt then owing was to remain that of Moore & Co., that the indebtedness to be thereafter created by the purchase of additional material was to become the debt of Moore & Co., and that Housley was to guarantee or stand security for the payment thereof. We think this oral promise, under the provisions of the Statute of Frauds (Vernon's Ann. Civ. St. 1925, art. 3995), did not have the effect to create an obligation for which Housley could be held legally liable.

[4] The merchandise company contends that Housley is estopped from avoiding his oral promise to guarantee the account of Moore & Co. because it was by this promise induced to furnish Moore & Co. materials for the completion of the buildings, and was induced to carry the account until the completion of the work and to forego taking steps to fix a statutory lien against the property of Housley to secure the indebtedness. This statute provides that no action shall be brought to enforce the performance of such a promise. The merchandise company, through its general manager, though charged with knowledge of this law, required of Housley no agreement except this oral promise. Housley did no more than make the promise which the manager proposed. The proposition to extend further credit and carry the account was made by Moore and accepted by the merchandise company. The proposal that Housley guarantee the account was made by the merchandise company and accepted by Housley. Nothing was said or done by Housley to induce the merchandise

company to change its course of action in securing a statutory lien. No fraud was committed on the. part of Housley which would work an estoppel against him.

[5] Though J. B. Moore, Sr., testified that he had no personal knowledge of the amount of materials used in making changes of construction of the buildings, not contemplated and provided for in the contract, nor their value, and that he did not personally know the amount of labor required in making such changes, and that his testimony was based upon written reports sent him by his foreman. the court over the objection of Housley permitted him to testify as to the value of such materials and labor, as shown by these reports. There was no evidence that the reports made to the witness by the foreman were correctly kept, or that they showed a true and correct account of materials and labor and the value thereof. This testimony was hearsay, and the court erred in not excluding it. Olive & Stemenberg v. Hester, 63 Tex. 190; Browning v. Hinerman. (Tex. Civ. App.) 224 S. W. 236.

We recommend that the judgments of both courts awarding recovery in favor of the Strawn Merchandise Company against Housley be reversed and rendered, and that said judgments awarding recovery in favor of Moore & Co. against Housley be reversed, and the cause of action involving the controversy between them be remanded to the district court.

CURETON, C. J. Judgments· of the district court and Court of Civil Apeals, in so far as they award recovery in 'favor of Strawn Merchandise Company against Housley, are reversed and rendered in favor of plaintiff in error; and the judgments, in so far as they award recovery in favor of Moore & Co. against Housley, are reversed and cause remanded to the district court, as recommended by the Commission of Appeals.

We approve the holding of the 'Commission of Appeals on the questions discussed in its opinion.