GULF LIQUID FERTILIZER COMPANY D/B/A WESTERN CHEMICALS,
Petitioner
v.
JAMES TITUS, Respondent

No. A-8431.   Decided February 28, 1962
354 S.W. 2d 378

*Dennison & Naylor,* Pecos, for petitioner.

*Russell & Tomlin,* Pecos, for respondent.

ON MOTION FOR REHEARING

ASSOCIATE JUSTICE JOE GREENHILL delivered the opinion of the Court.

The opinion heretofore rendered on November 15, 1961, is withdrawn and the following is substituted therefor.

The Statute of Frauds states, among other things, that no action shall be brought in any court to charge any person upon a promise to answer for the debt, default, or miscarriage of another unless the promise be in writing.[1] In this case, James Titus was sued by Gulf Liquid Fertilizer Company for merchandise which he purchased for the "Titus & Stracner Farm", a partnership, and also on his oral promise to pay a pre-existing debt of his partner, Lonzo Stracner. Lonzo Stracner was also sued, but he filed no answer and did not appear. The trial court, sitting without a jury, rendered judgment against Titus and Stracner, jointly and severally, for the merchandise Titus had purchased and also for the debt of Stracner. Titus alone appealed. The El Paso Court of Civil Appeals, in effect, reversed and rendered that judgment as to Titus on the Statute of Frauds point. It held that Titus's oral promise to pay the debt of his partner Stracner was unenforceable under the Statute of Frauds, and that the payments on the Stracner note out of the funds of the Titus and Stracner partnership were invalid. 345 S.W. 2d 422.

The facts are these: Lonzo Stracner accumulated an indebtedness of $7,183.58 with Gulf Liquid Fertilizer Company, for merchandise purchased in connection with his 1957 crop. On January 29, 1958, he gave his note to Gulf Liquid to evidence this debt. The note was payable in four installments of $1,500

---

1. Section 2, Art. 3995, V.A.C.S.

on the 15th of each month, beginning in July, 1958. The fifth and last payment, in an odd amount, was due on November 15, 1958.

Early in 1958, Stracner and Titus entered into a farming partnership. On March 3, 1958, a check was drawn from the account of the "Titus & Stracner Farm" (the partnership) for $1,500. It was prepared by Titus' wife who kept the books for the partnership, and was signed by Stracner. The only notation on the check was that it was for "fertilizer". On June 5, 1958, a second check, in the amount of $1,303, was sent to Gulf Liquid. It was signed by Titus. The check bore a notation that it was for "fertilizer and poison for June". Up to this point, the partnership had made no purchases. The amounts of these checks were credited as received by Gulf Liquid on the note of Stracner.

On June 24, 1958, the partnership made its first purchase of $339.60 on account from plaintiff, Gulf Liquid, doing business as Western Chemicals.

On July 9, 1958, a third check was sent to Gulf Liquid. It was drawn on the "Titus & Stracner Farm" account for $1,500 and was executed by Titus. The only notation on the check was that it was for "fertilizer and poison". It likewise was credited on the Stracner note.

After June 24, 1958, Titus made various purchases on open account from Gulf Liquid for fertilizer and poisons. The total amount purchased on credit in 1958 was $5,000.80. This account forms part of the amount in litigation, but there is no dispute as to the amount purchased or the charges made thereon. At least a part of this sale on credit in 1958 was made before Titus's oral promise to pay the Stracner note. Titus contends that the two checks for $1,500 and the third check for $1,303 should not have been credited on Stracner's note, but should have been applied on the debt created by the open account purchases on and after June 24, 1958. He concedes that there was no agreement to pay in advance for 1958 purchases. Ferguson, assistant manager of Gulf Liquid, testified that there was no agreement that the partnership would pay in advance; that no one told him or his company to do otherwise than to credit the payments on the Stracner note.

During 1958 Stracner disappeared, and Titus was left to run the farm and the partnership. The time of his departure was not fixed with certainty. Titus admitted that Stracner was not

back when he had his conversation with Ferguson. It was during this conversation that the oral promise was made by Titus. Titus testified that this conversation took place on or about July 15, 1958. Ferguson testified that it was earlier, at least as early as July 9, 1958 (by which time the partnership had purchased $725 of goods on credit).

Ferguson testified that in this conversation Titus specifically agreed to pay the Stracner note; that the promise was made in return for a continuation of credit by Gulf Liquid for the Titus & Stracner partnership for the 1958 crop year and for an extension of additional credit at the end of 1958 if needed. He also testified that Gulf Liquid would not have continued credit except for Titus's promise to pay the Stracner note, and at that time he had to decide whether to file suit. At another place in his testimony, Ferguson testified that Titus agreed "to take care of" the Stracner debt; that "he would pay that [note] out * * * and * * * if he needed additional credit, I agreed to give it to him." At another place, Ferguson testified that Titus promised that he would "see that the note was paid". Then again on direct examination, Ferguson said Titus said "I will pay" the note.

Titus testified that he agreed only to see that the Stracner note was paid, and that he meant by this that he would see that Stracner himself paid it; that he, Titus, was not going to get himself obligated, but that he would see that Stracner paid his debt. He also testified that he had no discussion with the officers of Gulf Liquid concerning credit for the partnership's 1958 crop or of credit being stopped if the promise to pay the Stracner note was not given; that he had no knowledge of the Stracner note until it was showed to him by Ferguson in mid-July of 1958, when he had already started buying on credit from Gulf Liquid; that it was not necessary for him to establish credit with Gulf Liquid because the financing of the 1958 crop had already been arranged with Western Cotton Oil Company which had advanced money to the partnership for the 1958 crop, and that a budget for fertilizer and insecticides and a bank account had already been set up.

The findings of fact of the trial court were these: that Stracner executed the note on January 29, 1958; that prior to June 24, 1958, (when Titus first purchased merchandise from Gulf Liquid for the partnership) the only debt owed by either Stracner or Titus to Gulf Liquid was the Stracner note; that the Stracner note was given in satisfaction of an open account

owing by Stracner to Gulf Liquid for fertilizer and insecticides purchased during 1957; that at the beginning of the 1958 cotton crop year, Stracner and Titus entered into a farming partnership for the 1958 crop year; that the "Titus & Stracner Farm" partnership paid by check $1,500 on March 3, 1958, and $1,303 on June 5, 1958, on the Stracner note; and that on those dates, neither Stracner nor Titus owed any debt other than the Stracner note to Gulf Liquid; that the "Titus & Stracner Farm" paid $1,500 by check on July 9, 1958, on the Stracner note, and that on that date Stracner and Titus were indebted to Gulf Liquid for $725 on open account and not otherwise except on the Stracner note; that there was no agreement between Gulf Liquid and Titus & Stracner that the latter would pay in advance for insecticides and fertilizers used during the 1958 crop year; that the balance at the time of trial owing on the Stracner note was $2,880.58 together with interest and attorney fees; that Gulf Liquid continued to sell Titus & Stracner fertilizer and insecticides from June 24, 1958, throughout the 1958 crop year on credit, and that the amount owing at the end of the 1958 cotton crop year was $5,000.80.

Regarding the oral promise of Titus, the court made these findings of fact:

"5. That Plaintiff Gulf Liquid Fertilizer Company, through its authorized employee, W. T. Ferguson, Jr., informed the Defendant James Titus that it did not desire to sell insecticides and fertilizer to the partnership of Lonzo Stracner and James Titus during the 1958 crop year on a credit basis until the indebtedness owing by Lonzo Stracner, represented by the promissory note dated January 29, 1958, had been taken care of and satisfied.

"6. That the Defendant James Titus, in order to obtain credit for the partnership of Stracner and Titus from Plaintiff during the 1958 crop year, *agreed to pay* to Plaintiff *the indebtedness* represented by the said note dated January 29, 1958, in the sum of $7,183.58, *or to see that same was paid.* (Emphasis ours.)

"9. On June 24, 1958, Plaintiff Gulf Liquid Fertilizer Company, relying upon the agreement of Defendant James Titus to pay the said note dated January 29, 1958, or to see that same was paid, and the partial performance by Defendant James Titus of said agreement, began to sell fertilizer and insecticides to the partnership of James Titus and Lonzo Stracner

on credit and continued to do so during the 1958 cotton crop year."

The trial court's conclusions of law were that the Stracner note is a valid obligation; that the agreement of Titus to pay the Stracner note is not barred by the Statute of Frauds because it has been fully performed by Gulf Liquid and partially performed by Titus; that Gulf Liquid is entitled to judgment against Titus and Stracner for the sums specified in the judgment.

Because of their importance, these additional conclusions of law are set out in full:

"2. *That the Defendant James Titus made an unconditional promise to pay the indebtedness* owning to Plaintiff by Defendant Lonzo Stracner as evidenced by said note dated January 29, 1958.

"3. That the promise of Defendant James Titus to pay the indebtedness owing by Defendant Lonzo Stracner on said note *was an original obligation and was supported by a new and independent consideration;* that is, that Plaintiff would sell fertilizer and insecticides to the partnership of Stracner and Titus during the 1958 cotton crop year on credit.

"4. That the promise and agreement of the Defendant James Titus to pay the obligation of Defendant Lonzo Stracner as represented by said promissory note, was not within the prohibition of the Statute of Frauds since said promise and agreement was an original obligation and supported by a new and independent consideration." (Emphasis ours.)

■ One of the problems here is the meaning of the trial court's finding of fact Number 6, that Titus "agreed to pay to plaintiff the indebtedness represented by the said note * * * *or* to see that same was paid." The trial court's "conclusion of law" was that Titus agreed unconditionally *to pay* the note. Nevertheless, the Court of Civil Appeals treated the trial court's findings of fact as a finding of a "collateral" and "conditional" promise, and therefore barred by the Statute of Frauds. The case for Titus is well presented in the opinion of the Court of Civil Appeals and need not be repeated here. We have concluded, however, that there is evidence to support the finding of the trial court that Titus intended to accept primary responsibility for the Stracner note and that the consideration he received in return for his promise satisfied the "leading object" or "main purpose" rule.

We therefore hold that his promise is outside the Statute and enforceable.

The Statute of Frauds was first enacted in England in 1677. Considering modern rules of evidence and business practice, there are some who believe that insofar as applicable to facts similar to those here, such statute has outlived its usefulness.[2] It is a two-edged sword. It is argued that it may be used to perpetrate frauds as well as to prevent them. Under it a person may obtain a substantial benefit for himself under an oral promise to pay the debt of a third person and then resist payment on the ground that his promise is oral and therefore unenforceable under the Statute of Frauds. Because of this and other dangers, the courts of England and this country have sought to keep the Statute within its intended purpose.[3]

The Statute has given rise to literally thousands of cases. Yet on the problem before us, no clear, settled rules for its construction have been devised. The problem is not finding authorities but of attempting to find the "true or better rule". There are many different factual circumstances under which the Statute is invoked. We shall attempt to limit this opinion to the general factual situation here presented.

■ In determining whether a promise to pay the debt of another is within or without the Statute of Frauds, one test devised by the courts is whether the promisor, by his promise, is a *surety* and is therefore secondarily liable, or whether he has accepted *primary responsibility* for the debt of another. By this test if an oral promise creates the relationship of surety and principal between the promisor and the original debtor, and if the fact is known to the creditor-promisee, it is within the Statute and is therefore unenforceable. An oral promise creating *primary responsibility* in the promisor to the creditor-promisee is without the Statute and is therefore enforceable. Professor Williston suggests that:

"The test which it is submitted is the accurate one * * * is whether a promisor is, to the actual or presumed knowledge of the creditor, a surety; if so, his promise is within the

---

2. See Grether, "Caveat Promisees; Nebraska's 'New Consideration' Test and the Anachronistic Statute of Frauds", 33 Nebraska Law Rev. 577, 600 (1954).

3. All sections of the Statute of Frauds have now been repealed in England except those covering promises to pay the debt, default, or miscarriage of another, and contracts for the sale of land. 68 Harv. L. Rev. 383.

Statute." 2 Williston, *Contracts* (Rev. ed. 1936), p. 1335, Sec. 462.

Professor Corbin agrees:

"Wherever the relation between the two obligors is that of principal and surety and this fact is known to the creditor, the case is within the statute. Supposed distinctions between a 'surety' and a 'guarantor' are not material in this connection." 2 Corbin, *Contracts* (1950 ed.), p. 247, Sec. 358.

Thus the courts have denied a recovery as being within the Statute where the promisor has promised to pay the debt of another only as a surety, but hold promises to be enforceable where the promisor has in effect made the debt his own and has assumed primary responsibility. The fundamental idea behind this is that a person should not be able to escape performance of oral promises to pay his own debts by use of the Statute of Frauds.

The courts have sometimes formulated rules which state that "original" promises to pay the debt of another are without the Statute, while "collateral" promises are within. These terms have been defined in so many and conflicting ways that they are of no real value except perhaps to express a result already reached, i.e., that a promise is or is not within the Statute.[4] For this reason, they will not be used in this opinion except where it is unavoidable.

In reading the cases and the texts, it appears to us that most cases have turned upon two or more of the following inquiries which are made to determine whether an oral promise to pay the debt of another is without the Statute and enforceable. They are phrased in different ways by different courts, but in substance they are:

■ 1. Did the promisor intend to create primary responsibility in himself to pay the debt, or did he intend merely to be a surety? The courts may answer this question by saying that the words used in making the oral promise are, themselves, so clear as to be unsusceptible of any other intent than to be, or not to be, only a surety as a matter of law. Or the courts may find that the words are not clear and that the question of intent is one for the finder of fact, taking into account all the facts and circumstances of the case, including the words used by the

4. 2 Corbin, *Contracts* (1950 ed.). p. 218, Sec. 348.

promisor. Closely allied with this test is number 3 set out below: was the promise given to subserve some desire of the promisor, or was his purpose merely or only to act as a surety?

2. Was there consideration for the promise? This inquiry is the same that would be made for any other promise, oral or written. Sufficient consideration is necessary to create a binding contract, generally speaking.

■ 3. Is the consideration given for the promise the sort of consideration which the courts say is necessary to take the promise out of the Statute? Not all consideration, though sufficient in law, is sufficient for this purpose; and a majority of the courts have applied, in this regard, a rule called the "main purpose" or "leading object" rule. This rule places the promise without the Statute, and therefore enforceable, if the consideration given for the promise is primarily for the promisor's own use and benefit. In this area the terms "collateral" and "original" are also sometimes used: "collateral" referring to a promise for which the promisor does not get the main benefit; and "original" referring to one where he does.

We now apply these three tests to this case.

I. *Was there a promise of primary responsibility to pay, or was there a promise of suretyship?*

This Court said in *Bank of Garvin v. Freeman,* 107 Texas 523, 181 S.W. 187:

> "The meaning of that statute is to require a promise as surety for another's debt, or guarantor of another's debt, to be in writing. It never was intended to prohibit one person from assuming the payment of another's debt, as his own debt, where there is a valid consideration moving between the parties to such contract. In other words, one person for a valuable consideration may assume as his own debt the debt of another, and it need not be in writing, but he cannot contract with one person to become surety or guarantor for the debt of another person except it be in writing." (p. 191.)

■ Unless reasonable minds could not differ as to the intent of the promisor to be a surety or not, the precise words or form used are not controlling. 2 Corbin, *Contracts* (1950 ed.) 247, Sec. 358; 2 Williston, *Contracts* (Rev. ed.), p. 1339, Sec. 465. If the words used are not clear and are susceptible of more than

one meaning, the question of intent to be primarily responsible for another's debt is one for the finder of fact, taking into account all the facts and circumstances of the case including the words used by the promisor. *Warren v. Smith,* 24 Texas 484, (1859); *Higginbotham-Bartlett Co. v. Dickey,* 27 S.W. 2d 248 (Texas Civ. App. 1930, error dismissed); *Shahan-Taylor Co. v. Foremost Dairies, Inc.,* 233 S.W. 2d 885 (Texas Civ. App., n.r.e., 1950); *Moraz v. Melton* (Ark. Sup.) 268 S.W. 41 (1925); annotation, 20 A.L.R. 2d 246 at 248; 2 Williston, *Contracts* (Rev. ed.) 1340, Sec. 465; Stearns, *Law of Suretyship* (5th ed.) 36, Sec. 3.7. As was stated in the *Dickey* case, cited just above:

> "We cannot say, as a question of law, that the agreement pleaded and as found by the court is an original agreement not within the statute as distinguished from a collateral agreement within the statute. This we would have to do, to be justified in disturbing the judgment of the trial court. If the evidence raised an issue of fact as to whether it was one or the other, then the trial judge trying the case without a jury must be deemed to have found the agreement was collateral. The appeal does not challenge the findings of fact, but only a conclusion of law. We at least cannot say that that conclusion was wrong." 27 S.W. 2d 248, 250.

The Supreme Court of Arkansas had a similar question in the *Melton* case, cited just above, where the promisor said "he would see" that the debt was paid. That court concluded:

> "In determining whether an oral promise is original or collateral, the intention of the parties at the time it was made must be regarded; and in determining such intention the words of the promise, the situation of the parties, and all of the circumstances attending the transaction should be taken into consideration." 268 S.W. 41, 42.

The Arkansas Court concluded that although the words were "to see that the debt was paid", the promise was construed to be one "to pay" and was held to be enforceable.

We have a fact finding by the trial court that Titus agreed to pay or to see that the debt was paid. The Court of Civil Appeals has treated the character or nature of Titus's promise as "conditional" and "collateral", and based its decision upon an emphasis on the portion of the trial court's finding of fact that Titus agreed "to see that same was paid". In effect, that Court

concluded that the words used evidence an intent not to assume primary responsibility but rather to be a surety.

There is, however, evidence that Titus agreed "to pay". Those words indicate an intention to accept primary responsibility. There is also evidence that he agreed "to see that the debt was paid". These words are subject to several interpretations as to intent. The additional words, "or see that the debt was paid", particularly when accompanied by other words of promise to pay, could be interpreted to mean that he, Titus, would arrange for payment if he were unable to pay the note as he had promised. This is still a promise of the nature or character of one to accept primary responsibility.

■ The findings of fact and the conclusions of law will be construed together; and if the findings of fact are susceptible of different constructions they will be construed, if possible, to be in harmony with the judgment and to support it. *Elder, Dempster & Co. v. Weld-Neville Cotton Co.*, 231 S.W. 102 (Tex. Comm. App. 1921) ; *Cook v. Mann*, 40 S.W. 2d 72 (Texas Comm. App. 1931) ; *Daniels v. Wight*, 249 S.W. 454 (Tex. Comm. App. 1923) ; *State v. Macken*, 162 S.W. 1160, (Texas Civ. App., writ ref., 1914).

We think the words used by Titus, in the context in which they were used, are not so clear as to be capable of only one construction. The trial court concluded that the promise of Titus was "an unconditional promise to pay" and that "the promise of Titus to pay was an original obligation." While we think reasonable minds could differ on the meaning and intent of Titus, we cannot say as a matter of law that the trial court was wrong in its interpretation.

II. *Was there sufficient consideration to support the promise to pay?*

■ The next inquiry is whether there was sufficient consideration to support Titus's promise to pay Stracner's note. *Muller v. Riviere*, 59 Texas 640 (1883). There must of course be sufficient consideration to make any promise a binding and enforceable one. 1 Corbin, *Contracts* (1950 ed.), Sec. 110. The Court of Civil Appeals held that the consideration passing to Titus was not sufficient. We conclude that it was.

There was conflicting evidence on whether consideration passed in return for Titus's promise. On the one hand, Titus

testified that the partnership had already arranged a loan to pay for the 1958 crop with a third party, Western Cotton Oil Company, and that they therefore did not need credit from Gulf Liquid. On the other hand, Ferguson testified that credit for the partnership would not have been extended for its 1958 crop except for Titus's promise to pay; that Titus did want credit; that he, Ferguson, promised to extend credit in return for Titus's promise; and that the partnership was in fact extended credit to the extent of $5,000 in reliance on the promise. The trial court resolved this question in favor of Gulf Liquid. It decided by its findings of fact numbered 5, 6, and 9, that there was consideration in the form of credit extended by Gulf Liquid to the "Titus & Stracner Farm" for its 1958 crop. The determination left for this Court is only as to the sufficiency of that consideration.

As to that question, there would seem to be little doubt. The cases have frequently held that a promise to extend credit is sufficient consideration for another promise in a bilateral contract. *Muller v. Riviere,* 59 Texas 640 (1883) ; *Binge v. Gulf Coast Orchards Co.,* 67 S.W. 2d 1045 (Texas Civ. App., no writ, 1934) ; *Universal C.I.T. Credit Corporation v. De Lisle,* 287 P. 2d 302 (Wash. Sup., 1955) ; *National Refining Co. v. McDowell,* 201 S.W. 2d 342 (Mo. Sup., 1947). We therefore hold that there was consideration for Titus's promise.

### III. *Was the consideration such as to remove the promise from the Statute of Frauds?*

There is a difference between adequacy of consideration in law and the sort of consideration which the courts say is necessary to take the promise out of the Statute. Professor Corbin explains this difference:

"It should be noted in the beginning that a consideration may be sufficient to satisfy the requirements of the common law of contracts without being sufficient to satisfy the 'leading object' rule and take the promise out of the statute of frauds. A promise is not out of the statute merely because there is a consideration for it. * * * The statute is applicable to promises to answer for the debt of another for which there is some sufficient consideration. It appears, however, that certain kinds of consideration will prevent a promise from being one 'to answer for the debt of another' and will make the promisor a debtor on his own account". 2 Corbin, *Contracts* (1950 ed.), 279, Sec. 367.

Corbin continues:

"The 'leading object' that is sufficient to take a promise out of the statute must be found in the consideration for the promise and not in the promise itself or in the result of its performance. The promise is itself a promise to a creditor to pay a debt due to him from a third party; if it is not such a promise, it is certainly not within the statute. The performance of the promise will clearly benefit the creditor; and it will benefit the debtor too by discharging his duty to that creditor. * * * The *promisor* is not in the least benefited by the performance of his own promise. *In order to take his promise out of the statute, he must be bargaining for a consideration that is beneficial to himself and that constitutes his primary object of desire.*" (Emphasis added.) *Ibid.*, 284.

The "leading object" or "main purpose" rule has been adopted by the American Law Institute in its *Restatement of the Law of Contracts*, Sec. 184. This rule was announced by this court in *Lemmon v. Box*, 20 Texas 329 (1857), where it said:

"* * * that wherever the main purpose and object of the promisor is, not to answer for another, but to subserve some purpose of his own, his promise is not within the statute, although it may be in form a promise to pay the debt of another, and although the performance of it may incidentally have the effect of extinguishing the liability of another.

"Here the leading object of the plaintiff (as charged in the plea) was not to guarantee or to secure the debt of the Carpenters * * * but it was to subserve some purpose of his own." (p. 333.)

The rule was followed in *Muller v. Riviere*, 59 Texas 640 (1883), and by a number of opinions of the Courts of Civil Appeals.[5]

There is one case by the Commission of Appeals which has language in it contrary to this rule. In *Housley v. Strawn Merchandise Co.*, 291 S.W. 864 (1927, opinion not adopted by this Court), it was said that the "main purpose rule" is not applied in this State. The promisor in that case "guaranteed" the pay-

---

5. *Enterprise Trading Co. v. Bank of Crowell*, 167 S.W. 296 (Texas Civ. App., no writ, 1914); *Kollatt v. Clements*, 3 S.W. 2d 855 (Texas Civ. App., error dismissed, 1928); *Ellington v. Pirtle*, 102 S.W. 2d 524 (Texas Civ. App., error dismissed, 1937); *Brown v. Majors*, 251 S.W. 2d 786, (Texas Civ. App., no writ, 1952).

ment of the debt of another. Under the facts of that case the court concluded that the promise was therefore "collateral" or "conditional".

Whether therefore we regard the statement in the *Housley* case as dictum, or whether we consider it to be out of line with *Lemmon v. Box*,[6] 20 Texas 329, *Muller v. Riviere*, 59 Texas 640, and the more recent opinions of the Courts of Civil Appeals, we here hold that the "leading object" or "main purpose" doctrine announced in *Lemmon v. Box* should and does apply in this state.

We now apply the "main purpose" doctrine to this case. Assuming as we have that Titus, for a consideration, made a promise to pay the debt of Stracner, was his main purpose and object to subserve some purpose of his own? The trial court found as a fact that the promise was made "in order to obtain credit for the partnership of Stracner and Titus". The trial court also concluded that the promise was supported by a new and independent consideration, the sale of merchandise on credit during 1958, but for which the credit would not have been extended. We find no evidence that the promise was made for Stracner's benefit. The fact that Stracner had left him and that Titus was trying to produce a crop in 1958 without his partner is evidence that he gave the promise primarily to benefit himself. Assuming as we have that he made the promise to obtain the credit, the crucial point is that the consideration necessarily benefited him as a member of the partnership because he shared in the partnership's ultimate profits, if any, and the benefit he received as a member of the partnership is considered sufficient to satisfy the "main purpose" rule. We think there are facts to support the findings and conclusions of the trial court. We therefore hold that the oral promise of Titus is enforceable and is not barred by the Statute of Frauds.

This opinion has stated that the courts have used two or more of the following tests to determine whether an oral promise is outside of the Statute of Frauds: (1) the promise was made to subserve some main purpose of the promisor, Titus; (2) the promisor, Titus, agreed to become primarily liable for the debt of the debtor, Stracner, and not simply or only to act as a guarantor or surety; and (3) the promise was supported by consideration. We have also held that there is evidence to satisfy all three tests

---

6. In reviewing the authorities, Corbin recognized the *Housley* case as being critical of the "leading object" rule. But he also correctly observed that the court in that opinion "did not review the Texas decisions on the point excepting to distinguish *Lemmon v. Box*." 2 Corbin, *Contracts* (1950 ed.) 276, Sec. 366, f.n. 4.

in this case. We are safe in saying that whatever test is used, the promise must be supported by consideration. It is unnecessary for us to decide here whether the other two elements must also be present at the same time. We have here held that the "main purpose" doctrine is applicable in this State.

One point remains: The Court of Civil Appeals held that Gulf Liquid was not authorized to apply the checks of the partnership of $1,500 and $1,303 on the debt of Stracner. Under the facts and holding of this case, that point becomes immaterial. Since Stracner and Titus are jointly and severally liable for the full amount of the note and the merchandise purchased in 1958, the payments are credited on the total debt of both.

The judgment of the Court of Civil Appeals is reversed and that of the trial court is affirmed.

The motion for rehearing is overruled.

Opinion delivered February 28, 1962.