**FIRST NATIONAL BANK IN DALLAS,**
Appellant,

v.

**HAAS DRILLING CO., Inc., Appellee.**

No. 17322.

Court of Civil Appeals of Texas.

Dallas.

Sept. 29, 1969.

Rehearing Denied Oct. 31, 1969.

**30**

Ernest E. Figari, Jr., Coke & Coke, Dallas, for appellant.

Marshall Boykin, III, Wood, Boykin & Wolter, Corpus Christi, for appellee.

CLAUDE WILLIAMS, Justice.

This action was instituted by Haas Drilling Company, Inc. (hereinafter referred to as Haas) against First National Bank in Dallas (hereinafter referred to as Bank) based upon an alleged oral promise on the part of Bank, acting by one of its officers, that Bank would pay certain debts owed to Haas by another corporation, B & B Gas Petroleum, Inc. (hereinafter referred to as B & B). Bank specifically denied that such oral promise was ever made on its behalf and also pled that any such oral promise, if made, would be in contravention to the Statute of Frauds, and therefore unenforceable.*

The case was submitted to the court and a jury. Based upon answers of the jury to special issues the trial court rendered judgment against Bank and in favor of Haas for $7,607.69. Bank appeals.

Certain of the material antecedent facts appear to be without dispute. Appellee Haas is a corporation engaged in supplying compressed jetting gas to various owners and operators of oil leases in South Texas. Jetting gas is utilized by the operator of a lease to cause oil to be lifted from the bottom of the oil-producing formation. B & B was the owner and operator of several oil leases located in San Patricio County, Texas, one of which was known as the Cantu Lease. Some time in 1964 B & B started purchasing jetting gas from Haas for its operation of the Cantu Lease. B & B was a slow paying account and on numerous occasions Haas threatened to cut off the gas in order to collect the sums due it. It is undisputed that cutting the gas off would have caused the production of oil to fall to the bottom of the formation, requiring the well to be reworked at considerable expense. Moreover, it was possible that if the gas was cut off production of oil might never be restored, thus making the well worthless.

In July 1964 the Bank made a loan to B & B in the principal amount of $250,000, such loan being secured by a note and mortgage on several oil leases, one of which being the Cantu Lease.

In payment for the jetting gas furnished to the Cantu Lease through September of 1965, B & B executed and delivered to Haas its promissory note in the principal sum of $5,165.13, upon which a payment in the amount of $500 was subsequently made and credited, leaving an unpaid balance of $4,-

---

* The Statute of Frauds referred to is Art. 3995, Vernon's Ann.Civ.St. of Texas, which provides:

"No action shall be brought in any court in any of the following cases, unless the promise or agreement upon which such action shall be brought, or some memorandum thereof, shall be in writing and signed by the party to be charged therewith or by some person by him thereunto lawfully authorized:

* * * * *

2. To charge any person upon a promise to answer for the debt, default or miscarriage of another; * * *."

665.13. B & B also owed Haas the sum of $2,943.51 for gas furnished to the Cantu Lease during the months of September, October, November and December of 1965.

About August 1965 the production from the Cantu Lease began to fall off drastically and about that time B & B became in default on its obligation with the Bank. In the early part of January 1966 the Bank sent its chief engineer to make an inspection of the leases covered by the mortgage and, following such inspection, the engineer recommended to the Bank that it take over the operation of the leases until they could be sold at foreclosure sale. About the middle of January 1966 the Bank assumed operation of the mortgaged leases, including the Cantu Lease, and employed a Mr. R. C. Hagens to operate the leases.

On February 2, 1966 Mr. Richard Haas wrote Mr. Hagens and advised him that unless the account for furnishing gas to the Cantu Lease was paid within fifteen days Haas would be forced to discontinue sending gas. On February 3, 1966, Mr. H. M. Meredith, a vice-president of the Bank, replied to this letter stating in effect that it was the Bank's intention to post the properties for foreclosure on March 1st and either buy them or sell them to a third party. For that reason, Mr. Meredith said in the letter, " * * * we would appreciate your reconsidering your decision to discontinue sending gas to this lease on February 17. We feel that a satisfactory arrangement can be made with you either by us or a third party within a few days after March 1."

On or about February 7, 1966 Mr. Richard Haas had a telephone conversation with Mr. H. M. Meredith concerning the transaction. The record reveals two different versions of this telephone conversation.

Mr. Richard Haas' version of the telephone conversation was:

"A. I told Mr. Meredith that we had to have our money on that lease and that I had given Mr. Hagens fifteen days to catch up with it completely, and Mr. Meredith asked that I not cut the gas off; that they were going to go ahead and have a sale to be held on the steps of the courthouse at Sinton, Texas, on March the 1st, at which time we could either bid on the property ourselves and cash out our account owed there, or that they would sell the property or possibly buy it back themselves.

Q. All right, was anything else said with reference to the account?

A. Well, he asked that I leave the gas on and he persuaded me that I would get my money, and so therefore I left the gas on."

He further testified that Meredith told him that if he would leave the gas on he, Meredith, was coming down to Sinton on March 1st and that he would settle it out at that time. On cross-examination Haas testified that Meredith "assured me even before that that I would get my money; not to worry about it, that they were going to have this sale and he would be down there and we would settle it up."

According to Mr. Meredith's testimony the substance of the telephone conversation was:

"He told me that he wanted his bill paid and I told him * * * that the Bank felt like when we foreclosed on March the 1st, that if we received bids in excess of our debt owed by B and B, I felt my committee and my people would look favorably on remitting to him any excess over our loan, and following that I told him that if the Bank had to buy it in and if we sold at a later date, that if we received more than what the Bank's loan was that I thought my people would look favorably upon remitting him any excess."

After this telephone conversation it is undisputed that Haas continued to furnish gas to the Cantu Lease and that the Bank paid for this gas.

On March 1, 1966 Mr. Meredith and Mr. Lawrence L. Beason, one of the Bank's general counsel, went to Corpus Christi to conduct a foreclosure sale. Although other active bidders were present the Bank made the highest offer and the properties were purchased for $110,000, resulting in an unpaid balance on B & B's loan in the sum of $86,000.

Following the foreclosure sale Mr. Meredith and Mr. Beason visited with Mr. Haas and engaged in a conversation with him concerning the matter of indebtednesses of B & B. The testimony of the witnesses, Mr. Richard Haas and Mr. W. C. Galbraith, for appellee, and Mr. H. M. Meredith and Mr. Lawrence L. Beason, for appellant, is clearly in dispute.

Mr. Haas testified:

"I said, 'Well, it looks like you all bought the lease back,' and he said, 'Yes, we don't think the bid was high enough and we think the lease will bring more money and we want to produce the wells for just a little while and we think that we can sell the lease,' and I immediately said, 'Well, now, what I am interested in is getting my money and you said we will straighten this out when you came down here today.' So, we discussed B and B a short time and Mr. Meredith told me that they were going bankrupt and that they had a foreclosure on this lease which I expected, for them to start operating it. I told Mr. Meredith that I needed my money; that this was a small plant and every bit of the gas counted and he said, 'Well, I can certainly understand your problem there,' and I said, 'Well now, I am going to look to you to get my money,' and he said—he assured me— first he said he was going to try to get it from B and B for me, but that he

would be responsible for getting my money to me and he would like for me to continue giving them gas until they could sell the property in order to not let the well sand up and to keep producing."

He also said:

" * * * I talked at considerable length that there would be no mistake about it; if I left the gas on I would get my money, and he agreed. He would get me my money and he asked that I leave it on because he said, 'If you cut it off I can't sell the property and therefore all of us lose,' and he wanted to have an opportunity to get the production going and sell the properties for more than what he had bid on at the courthouse steps, and so after much consideration I agreed again, thinking that it was the Bank and I could take their word for it. * * * He said he thought he could sell the property in a month or two and he would definitely have my money by that time."

Mr. Galbraith, a witness for appellee, testified that he heard the conversation between Haas and Meredith and that Meredith had told Haas that while he still had hopes on B & B paying the indebtednesses that he, Meredith, would see that Haas got their money when the lease was sold.

Mr. Meredith testified that Mr. Haas made it very clear to him that he was looking to the Bank for the payment of the approximate sum of $7,000 that B & B owed Haas. He said:

"I made it very clear to him that I certainly sympathized with him; that we acknowledged the debt of B and B owed to Haas or Sinton Gathering System, but the Bank did not feel like it was their responsibility to pay B and B's debts. * * * I told him that we had several people interested in the property * * * and I told him at that time that if the Bank received an amount in excess of

what was owing to it that my people would certainly look with favor upon remitting to Mr. Haas any excess amount over our debt."

He concluded his testimony by stating that he made it clear to Mr. Haas that the Bank considered B & B's debt to be the debt of B & B and not the debt of the First National Bank. He positively denied that at any time during the course of the relationship with Mr. Haas that he ever told Mr. Haas that the Bank would take care of B & B's debt.

Mr. Beason's testimony was substantially similar to that of Mr. Meredith.

Thereafter Haas continued to furnish gas to the Cantu Lease and same was paid for by the Bank. Several days following the conversation Haas telephoned Mr. Meredith and suggested that Haas assign B & B's note to the Bank for collection. Mr. Meredith rejected this proposal. Thereafter, the Bank expended several thousand dollars in an effort to improve the condition of the lease and finally sold the same. The proceeds of the sale did not, however, extinguish the unpaid balance of B & B's note to the Bank. Following the sale of the lease Mr. Meredith wrote to Mr. Haas stating:

"We certainly appreciate your cooperation in this transaction. I am sorry our negotiations did not allow us to take care of B & B's old bills; however, since the bank still has some exposure on B & B's note to us, there was little else we could do."

Following receipt of this letter Mr. Haas telephoned Mr. Meredith and in this regard he testified:

"I said, 'Mr. Meredith, this was not at all our trade on this gas; that you were to take care of this obligation of paying for this gas and you assured me that you would at the time of selling this property,' and he said, 'Well, we didn't get all of our money back out of it, so therefore there is nothing I can do.' I told him

that I thought it was an awfully poor policy and I certainly believed that the Bank would do what they said they would do and I was very disappointed in it."

Following receipt of the letter from Meredith and after making the telephone call, Mr. Haas wrote B & B demanding that the account be paid. Failing to receive payment from B & B, Haas instituted this suit.

## OPINION

In its first two points of error on appeal appellant Bank contends that the trial court erred in refusing to grant its motion for judgment *non obstante veredicto,* and also its motions for directed verdict, because the evidence was conclusive that the alleged oral promise relied upon was within the Statute of Frauds and therefore unenforceable, as a matter of law.

The Statute of Frauds, originally enacted in England in 1677, and being a part of the Acts of 1840 of Texas, clearly precludes the institution of an action to charge any person upon a promised answer for the debt of another unless the promise be in writing. Seeking to avoid the disastrous effect of the interdiction of this statute upon its cause of action, Haas pled and relied upon what is commonly known as the "leading object" or "main purpose" rule to take the case out of the Statute of Frauds.

The "main purpose" rule or "leading object" doctrine was first announced in 1857 by our Supreme Court in Lemmon v. Box, 20 Tex. 329, wherein Chief Justice Hemphill, after expressing grave doubt which had been created by fine distinctions and subtleties which had been drawn by the courts with regard to the clause of the statute dealing with a promise to pay the debt of another, pronounced the general rule, as follows:

"* * * that wherever the main purpose and object of the promisor is, not to

answer for another, but to subserve some purpose of his own, his promise is not within the statute, although it may be in form a promise to pay the debt of another, and although the performance of it may incidentally have the effect of extinguishing the liability of another."

While some doubt was cast upon the rule by the Commission of Appeals in Housley v. Strawn Merchandise Co., 291 S.W. 864 (1927, opinion not adopted by the Supreme Court), our Supreme Court, in Gulf Liquid Fertilizer Co. v. Titus, 163 Tex. 260, 354 S.W.2d 378 (1962), stated unequivocally that the "main purpose" doctrine is applicable in Texas. The court said:

"In determining whether a promise to pay the debt of another is within or without the Statute of Frauds, one test devised by the courts is whether the promisor, by his promise, is a *surety* and is therefore secondarily liable, or whether he has accepted *primary responsibility* for the debt of another. By this test if an oral promise creates the relationship of surety and principal between the promisor and the original debtor, and if the fact is known to the creditor-promisee, it is within the Statute and is therefore unenforceable. An oral promise creating *primary responsibility* in the promisor to the creditor-promisee is without the Statute and is therefore enforceable."

Justice Greenhill, speaking for the Supreme Court, then stated that most cases dealing with the question have turned upon two or more of the following inquiries which are made to determine whether an oral promise to pay the debt of another is without the statute and enforceable: (1) Did the promisor intend to create primary responsibility in himself to pay the debt, or did he intend merely to be a surety? (2) was there consideration for the promise? and (3) is the consideration given for the promise the sort of consideration which the courts say is necessary to take the promise out of the statute?

Again, in Cooper Petroleum Co. v. LaGloria Oil & Gas Co., 436 S.W.2d 889 (1969), the Supreme Court reiterated the "main purpose" doctrine as spelled out in Gulf Liquid Fertilizer Co. v. Titus, supra, and again announced that the theory of the "main purpose" rule is that where the promise is made for the promisor's own benefit and not at all for the benefit of the third person, the reason for the statutory provision fails and the promise should be enforced. See also West Texas Production Credit Ass'n v. Harding Chemicals, Inc., 407 S.W.2d 950 (Tex.Civ.App., San Antonio 1966).

■ A careful reading of the testimony presented in this case, in the light of the amended pleadings filed by appellee, reveals sufficient evidence of probative force to create issues of fact, as discussed and enumerated by Justice Greenhill in Gulf Liquid Fertilizer Co. v. Titus, supra, so as to justify the submission of such issues to the jury. The proper answer to these questions is essential in the determination of the crucial question of whether the "main purpose" doctrine should apply to take the case out of the Statute of Frauds. Accordingly, it was not error for the court to deny appellant's motion for judgment *non obstante veredicto* or directed verdict.

■ In its points 3 to 7, inclusive, Bank complains of the court's method of submitting Special Issue No. 1, and the definition given therewith. Special Issue No. 1, and its attending definition, is as follows:

"Do you find from a preponderance of the evidence that on or about March 1, 1966, the Defendant, First National Bank in Dallas, by and through its vice-president, H. M. Meredith, agreed to assume payment as its own debt the indebtedness then owing to Haas Drilling Co., Inc. by B. & B. Gas and Petroleum, Inc.?

Answer 'Yes' or 'No'.

ANSWER: YES

You are instructed that by a person who agrees to assume payment of the debt

of another as its own debt is meant a person who intends to accept primary responsibility for payment of such debt, which intention is determined by taking into account all of the facts and circumstances surrounding the transactions between the parties including the words used by the person in making the promise, if any."

Appellant's point 6 presents the complaint made to the trial court prior to the submission of the issue that such issue was multifarious in that the one issue really submitted two distinct issues of fact.

We agree with appellant that the method of submitting Special Issue No. 1 in this case, in the light of the evidence developed, violates Rule 279, Vernon's Texas Rules of Civil Procedure, which directs the trial court to submit the controlling issues made by the pleadings and the evidence. Prior to the adoption of the Rules of Civil Procedure the Supreme Court in Fox v. Dallas Hotel Co., 111 Tex. 461, 240 S.W. 517 (1922), condemned the practice of submitting more than one ultimate fact issue in one special issue to be answered either "Yes" or "No". Our court, even earlier than Fox v. Dallas Hotel Co., supra, in Western Indemnity Co. v. MacKechnie, 214 S.W. 456 (Tex.Civ.App., Dallas 1919), held it to be error to submit two distinct questions of fact in one special issue, the answer to one question which might be answered in the affirmative and the other in the negative. More recently our Supreme Court in Roosth & Genecov Production Co. v. White, 152 Tex. 619, 262 S.W.2d 99 (1953), reviewed the prior authorities and held that it was reversible error to submit more than one ultimate controlling issue in one special issue.

We think that under the facts adduced in this record the court's action in submitting Special Issue No. 1 in the form submitted was reversible error. The issue asked the jury to answer two distinct questions of fact: (1) Was there in fact a promise on

the part of Bank to pay the debt of B & B, and (2) if there was such a promise then was it the Bank's intent to assume "primary responsibility" for the payment of such debt? Under the evidence, as reviewed above, the jury could very well answer either of these issues "Yes" or "No". Both questions incorporated in the one special issue are essential elements to appellee's recovery under the doctrine of "main purpose" or "leading object" discussed above. The evidence on each of the two crucial issues is indeed conflicting, as demonstrated above. The burden was upon appellee Haas to establish the elements of its recovery by a preponderance of the evidence. The answer of the jury to Special Issue No. 1 does not meet appellee's burden. The trial court fell into error in disregarding appellant's timely complaint to the manner of submitting the issue and such error requires a reversal.

■ We also think that appellant's complaint concerning the instruction of the court following Special Issue No. 1 is valid. The instruction did not go far enough and instruct the jury that to accept primary responsibility for the payment of the debt of another the promisor must unconditionally agree to be responsible for such debt. This element of unconditional responsibility was stated by the Supreme Court in Gulf Liquid Fertilizer Co. v. Titus, supra. In view of another trial of the case we think that the court should comply with appellant's request, timely made, to enlarge upon the jury instruction given in connection with the primary issue or issues relating to the "main purpose" doctrine.

As stated in connection with our disposition of appellant's points 1 and 2 we think there was some evidence of probative force to support the submission of appropriate issues on the "main purpose" doctrine. Accordingly, we overrule appellant's points 3, 4 and 5.

By its points 8 through 12, inclusive, appellant attacks the trial court's submis-

sion of Special Issue No. 2, and the definition of "consideration" given by the court. The issue and definition were as follows:

"Do you find from a preponderance of the evidence that the agreement of First National Bank in Dallas, if any, to assume payment as its own debt the indebtedness owing on or about March 1, 1966 by B & B Gas and Petroleum, Inc., to Haas Drilling Co., Inc. was made in consideration of the promise by Haas Drilling Co., Inc. to continue to furnish jetting gas to the Cantu lease?

Answer 'Yes' or 'No'."

"Consideration is that thing of value offered by one party to another in return for some thing of value. It may consist of a promise given by one party to another to do or refrain from doing something in return for the other party's promise to do or refrain from doing something."

■ Appellant objected to the submission of Special Issue No. 2 for several reasons, including one that the issue amounted to the submission of a question of law and that there was either no evidence, or insufficient evidence, to justify the submission of such issue. We do not think any of these contentions are valid and therefore overrule the same.

■ Appellant also objected to the definition of the term "consideration" as shown above because it was not the proper definition to utilize in connection with the application of the "main purpose" doctrine as set forth by the Supreme Court in Gulf Liquid Fertilizer Co. v. Titus, supra. Appellant specifically requested the court to give the proper definition as suggested by the Supreme Court. We agree with appellant's contention and sustain its point of error No. 12.

It is to be observed that the definition of "consideration" given by the court in this case is the ordinary dictionary definition of the term. As Justice Greenhill pointed out in Gulf Liquid Fertilizer Co. v. Titus, 163 Tex. 260, 354 S.W.2d 378 (1962):

"There is a difference between adequacy of consideration in law * * * which the courts say is necessary to take the promise out of the Statute. Professor Corbin explains this difference:

'It should be noted in the beginning that a consideration may be sufficient to satisfy the requirements of the common law of contracts without being sufficient to satisfy the "leading object" rule and take the promise out of the statute of frauds. A promise is not out of the statute merely because there is a consideration for it. * * * The statute is applicable to promises to answer for the debt of another for which there is some sufficient consideration. It appears, however, that certain kinds of consideration will prevent a promise from being one "to answer for the debt of another" and will make the promisor a debtor on his own account.' "

In the later case of Cooper Petroleum Co. v. LaGloria Oil and Gas Co., 436 S.W.2d 889 (1969) the Supreme Court elaborated upon the elements of the consideration required to apply the "main purpose" doctrine. In view of another trial of this case the specific element of the definition of "consideration" should be incorporated in the definition given by the trial court in connection with the special issue.

The judgment of the trial court is reversed and remanded.