

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-19-00371-CV

———————————————————

CATHY LUNA, INDIVIDUALLY AND D/B/A WINESTYLES; AND FRANK
LUNA, INDIVIDUALLY, Appellants

V.

JOHN A. PICKEL, Appellee

---

On Appeal from the 141st District Court
Tarrant County, Texas
Trial Court No. 141-293838-17

---

Before Gabriel, Kerr, and Bassel, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

## I. Introduction

The controversy below evolved out of the sale of a store that sold wine. The parties disagreed over who was responsible to pay the rent for the store's location. Appellee John Pickel, the plaintiff below, was one of the store's owners and was shown as a lessee on the lease for the store's location. Appellants Cathy and Frank Luna, the defendants below, are husband and wife, and Cathy entered into an agreement to purchase the store. After rent payments were missed, the landlord sued Pickel for the missed payments, and Pickel paid the rent. After a bench trial, the trial court entered judgment that the Lunas were liable to Pickel for rental payments that were not made during their occupancy of the store's location.

We hold that the evidence is legally and factually sufficient to support the trial court's findings that Cathy had breached a contract to assume the obligation for paying rent on the store's location. The evidence is also legally and factually sufficient to support the trial court's damage award. With respect to Frank, the only basis for a judgment against him is promissory estoppel, but Pickel concedes that the trial court's promissory-estoppel findings—that Frank made particular promises to Pickel—are not supported by evidence. Thus, because there is no evidence to support Pickel's recovery against Frank on a claim of promissory estoppel, we render judgment that Pickel take nothing as to Frank.

## II. Factual and Procedural Background

The original plaintiffs in the suit below were Pickel and his stepdaughter Amanda Ferguson. Their petition hinged on the following allegation:

> In conjunction with the April 2013 sale of Plaintiffs' business, Tasty Station f/k/a WineStyles Wine & Gifts (Business) located in Mansfield, Texas, to Defendant Cathy Luna, Defendants Frank and Cathy Luna agreed to assume payments on a lease (Lease) of the property at which the Business operated, approximately 1,800 square feet in the Mansfield Town East Shopping Center. The assumption of the lease payments was for Defendants' convenience as they purportedly worked to get a new lease with the landlord, which they had promised they would do.

Predicated primarily on this factual allegation, the petition pleaded causes of action for quantum meruit, promissory estoppel, conversion, fraud, and breach of contract. The Lunas answered the suit with a general denial and the affirmative defense of statute of frauds.

As a result of the events that occurred before and during trial, the parties originally involved in the suit changed and so did the claims. Amanda passed away before trial. Her claims were nonsuited when the trial began. As a result of directed verdicts entered at the close of the plaintiff's evidence, the trial court winnowed down Pickel's claims as the remaining plaintiff. The trial court granted directed verdicts on the causes of action for quantum meruit and conversion that Pickel had pleaded against the Lunas and on the fraud claim that Pickel had pleaded against Frank. These rulings left Pickel's causes of action for promissory estoppel and breach of contract as the only live claims.

3

At trial, the three witnesses were Pickel and the Lunas.

The store was a franchise; the lease for the store's location had been assigned to Pickel and his wife, and Amanda was made an additional tenant. During the time that Pickel and Amanda owned the store, Amanda ran it.

Prior to the sale, the Lunas were regular customers of the store. Cathy (but not Frank) entered into an Asset Purchase Agreement (APA) for the store that was also executed by Pickel and Amanda. The APA was negotiated by Amanda and the Lunas. The APA listed the assets being sold as the store's franchise, inventory, fixtures and furnishings, equipment, and goodwill. The APA did not mention the lease for the store's location, other than a provision that "Seller represents that the terms of the lease agreement have been fully disclosed to the Buyer and that Landlord fully consents to the transfer of the leasehold estate."

Because the store's business involved liquor sales, its operation required a license from the Texas Alcoholic Beverage Commission (TABC). A TABC license is specific to the location of the liquor store. The license for the store that Cathy purchased was held by Amanda, and at the time of the sale, Cathy did not have a license. The APA did not reference the license, other than in a two-sentence provision added to the agreement that stated that "[the purchaser] and Amanda [] have come to an agreement that [the purchaser] will be using Amanda[']s TABC license until hers arrives. Amanda will be the manager of the store until the permit . . . arrives."

4

Shortly after the execution of the APA, the franchisor executed a release of Amanda from her obligations under the franchise agreement for the store. The release recited that it would not become effective until "[t]he landlord for the [store] ha[d] approved Frank and Cathy Luna as tenants and they ha[d] either assumed the existing lease or [had] executed a new lease."

The controversy between the parties focused on the time period that the Lunas occupied the store's location. The Lunas began occupying the store's location in May 2013. The Lunas operated the store from that time until December 2015 or January 2016. The period of their occupancy covered most of the remaining term of the lease for the location, which ran through February 2016.

After Cathy and Frank moved out of the store's location in December 2015 or January 2016, they opened a new store that also sold wine. The Lunas claimed that they had to move because they had been unable to obtain an assignment of the lease for the store's location and thus had been unable to obtain a license to operate it as a store selling liquor. The license issued in Amanda's name that had permitted liquor sales from the store's location had apparently expired eight months before the Lunas had moved out, but they had continued to operate the store and to sell liquor from it even though they lacked a license to do so. At the time that they moved out of the store's location, they removed its inventory and then sold it at the new location that they opened.

When Cathy was initially asked about how rent was paid while she and Frank had occupied the store's location, she claimed that she did not make rental payments to the landlord, did not know if Frank did, and could not recognize Frank's signature on checks that had been sent to the landlord to pay the rent. Cathy claimed that she did not deal in the operation of the lease and had no idea about the operation of it. Frank apparently paid the rent and dealt with the landlord, though he initially claimed that he could not remember whether he had written checks to the landlord. Also, though Frank recognized the account from which the rent checks were written, he claimed that he could not recognize the specific checks that had been written from the account to pay the rent.

After initially denying knowledge of the rent payments that had been made while occupying the store's location, Cathy acknowledged that she had owed rent while she had occupied the location and that she had not paid rent for part of the time of that occupancy. Frank also acknowledged the obligation to pay the rent though he denied that the lease for the store's location had been assumed. In an exchange between Frank and opposing counsel, Frank conceded that the payment of rent was what had allowed the Lunas to remain in the space and to conduct their business from it.

With respect to any specific representation made to Pickel about payment of the rent, he acknowledged that he had never met Cathy before trial. He acknowledged that he did not know whether Amanda and Cathy had agreed that the

sale was contingent on Cathy's obtaining a new lease. He acknowledged that he did not know if the landlord had sued the Lunas for the rent or had sent them an invoice for the rent.

But Pickel testified that the Lunas had paid the rent due for the location, and he testified about what Frank had represented to him when the payments were not made while the Lunas occupied the location. Pickel testified that in early 2015 he had "started getting notices that [the Lunas] were in arrears as far as paying their lease." Pickel described how he had contacted Frank and testified about Frank's responses to his inquiries:

> Well, I called the landlord and talked to him, checked the facts and so on, and then this, you know, it's been a while, but normally what I did was just drop by the store and talk to Frank directly and go, okay, what's the deal here. And then Frank would go, well, I got the money or this or, you know, so on and so forth, different excuses.
>
> And then he would catch up, you know, I would call back later, a week or two later to the landlord, and he had caught up with the lease. This happened, I don't know, three times, maybe.

Later in 2015, Pickel received a demand letter that had been mailed from the landlord to Amanda that outlined additional defaults in the payment of rent. According to Pickel, Frank responded to Pickel's inquiries about the missed payments listed in the letter by saying "[t]hat he thought he could catch up based on his December sales. Holiday -- November and December normally were the best months of the year for the business because of the holidays." Though it is unclear as to which

7

conversation he was referring, Frank confirmed that he had told Pickel that he would make up the past-due rent when Pickel inquired about the missed payments.

Pickel stated that he had relied on Frank's December 2015 representations—that the missed rental payments would be made—and believed that he could have used the inventory from the store to make up the shortfall if the missed payments were not made. After the December conversation with Frank, Pickel was surprised when he arrived at the store a few weeks later and discovered that the Lunas had removed all of the inventory.

According to Pickel, the Lunas had never claimed that they did not owe the rent, that they had not assumed the lease, or that they had no responsibility under the lease. It was Pickel's understanding that they had assumed the lease or had signed a new one.

After the Lunas moved out of the store's location, Pickel was sued for past-due rent by the landlord. Pickel paid $40,000 in settlement of the landlord's suit.

As to what payments were missed while the Lunas occupied the location, the December letter from the landlord to Amanda showed unpaid rent and other charges for May through December 2015. The following exchange occurred when Frank was asked whether he had missed payments during this time frame:

> Q. All right. So if I was to say that you missed the payments on February 15th, May 15th, September 15th, October 15th, November 15th, and February of 2016, do you recall whether or not you made those payments?

A. I don't. I would have to look at a statement. I can't tell you right off the top of my head.

When again asked what payments were missed, Frank could not confirm or deny any missed payments because he did not have access to the business's bank statements.

Cathy launched several attacks to challenge Pickel's claim that she was obliged to pay rent while occupying the store's location. One attack disputed that the APA's representation that the terms of the lease were fully disclosed to her or that the landlord had consented to the transfer of the leasehold. Cathy and Frank also emphasized that they had never formally assumed the lease's obligations and that the landlord had never executed an assignment of the lease to them. The Lunas asserted that Cathy had never agreed to become responsible for the lease or had signed any document saying that she would.

The next attack claimed that the purchase of the store was contingent upon Amanda's obtaining a new lease in Cathy's name for the store's location and ensuring that Cathy obtained a TABC license to sell liquor from that location. But the Lunas acknowledged that the APA did not contain any provisions documenting these contingencies and described their own efforts to obtain an assignment of the lease. According to Frank, the landlord rebuffed their requests for an assignment because of animosity that he held for Amanda due to her prior treatment of him. Frank also claimed that rent payments were only made by him and Cathy while Amanda was helping to obtain a new liquor license from TABC.

9

After both parties rested their cases, the trial court agreed to accept additional briefing before ruling. Pickel filed a brief. The Lunas filed a brief that responded to Pickel's arguments and attached tens of pages of documents and affidavits that were not introduced during trial. Many of the documents were checks for rental payments.

After the filing of the briefs and documents, the trial court signed a judgment awarding relief to Pickel. The Lunas then filed "Defendants' Motion for Judgment Notwithstanding the Verdict and in the Alternative Motion for New Trial." The Lunas attached the same documents to this motion that they had attached to their post-trial brief and argued under Texas Rule of Civil Procedure 270 that the trial court should consider the documents as additional testimony. The Lunas also requested findings of fact and conclusions of law, which the trial court made.

The trial court also signed an amended judgment that awarded Pickel a judgment against Cathy and Frank, jointly and severally, for $40,000, plus attorney's fees. The Lunas responded to the amended judgment with "Defendants' First Amended Motion for Judgment Notwithstanding the Verdict and in the Alternative First Amended Motion for New Trial." The trial court denied this motion by written order. The Lunas then perfected an appeal to this court.

### III. Standard of Review

A trial court's findings of fact and conclusions of law entered after a bench trial must, when "taken together[,] [be] enough to support the judgment." *Tex. Outfitters Ltd., LLC v. Nicholson*, 534 S.W.3d 65, 74 (Tex. App.—San Antonio 2017), *aff'd*, 572

S.W.3d 647 (Tex. 2019). "The purpose of findings of fact is to discover the grounds the trial court found supported the judgment and to avoid presumed findings 'on all grounds raised by the pleading and proof.'" *Id.*

"We review the trial court's conclusions of law de novo[] and its findings of fact for sufficiency of the evidence." *Hegar v. Am. Multi-Cinema, Inc.*, 605 S.W.3d 35, 40 (Tex. 2020) (citation omitted). "Findings of fact in a bench trial have the same force and dignity as a jury's verdict upon jury questions. When challenged on appeal, the findings are not conclusive on the appellate court if there is a complete reporter's record." *Nipp v. Broumley*, 285 S.W.3d 552, 555 (Tex. App.—Waco 2009, no pet.).

We strive to reconcile the findings and conclusions drawn from them with the judgment:

> "[F]indings of fact and the conclusions of law will be construed together; and if the findings of fact are susceptible of different constructions, they will be construed, if possible, to be in harmony with the judgment and to support it." We will not draw inferences from the wording of findings of fact if those inferences do not support the judgment.

*Nicholson*, 534 S.W.3d at 74 (citation omitted) (quoting *Gulf Liquid Fertilizer Co. v. Titus*, 354 S.W.2d 378, 385 (1962)).

Under certain circumstances when the trial court does not make an explicit finding of fact, we may presume that a finding was made. Tex. R. Civ. P. 299. Rule 299 establishes when we may presume the making of a finding:

> The judgment may not be supported upon appeal by a presumed finding upon any ground of recovery or defense, no element of which has been included in the findings of fact; but when one or more elements thereof

11

have been found by the trial court, omitted unrequested elements, when supported by evidence, will be supplied by presumption in support of the judgment.

*Id.* The quoted provision of Rule 299 also establishes the circumstances under which we may not presume a finding; it prohibits the presumption when no element of a ground of recovery or defense is included in the finding of fact. *See id.* To protect against the waiver of a defense, no element of which is referenced in an original set of findings, a party must request additional findings under Texas Rule of Civil Procedure 298. *See* Tex. R. Civ. P. 298; *Levine v. Maverick Cty. Water Control & Improvement Dist. No. 1*, 884 S.W.2d 790, 796 (Tex. App.—San Antonio 1994, writ denied) ("If the trial court's original findings do not include any findings on a ground of recovery or defense, then the party relying on the ground of recovery or the defense must request additional findings of fact in proper form or the ground is waived.").

With respect to how we test whether the evidence supports a finding, when a party raises a legal-sufficiency challenge to an issue for which it did not have the burden of proof, "it must demonstrate on appeal that no evidence supports the adverse finding." *Graham Cent. Station, Inc. v. Peña*, 442 S.W.3d 261, 263 (Tex. 2014). In applying this standard,

> We will sustain a legal[-]sufficiency challenge if "'the evidence offered to prove a vital fact is no more than a scintilla.'" In conducting our review, "we credit evidence that supports the verdict if reasonable jurors could have done so and disregard contrary evidence unless reasonable jurors could not have done so." "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review."

12

*Id.* (citations omitted).

How we review the factual sufficiency of the evidence also turns on which party bore the burden of proof at trial:

> If a party is attacking the factual sufficiency of an adverse finding on an issue to which the other party had the burden of proof, the attacking party must demonstrate that there is insufficient evidence to support the adverse finding. In reviewing an insufficiency[-]of[-]the[-]evidence challenge, the court of appeals must first consider, weigh, and examine all of the evidence that supports and that is contrary to the jury's determination. A court must sustain an insufficient evidence point when the "evidence adduced to support the vital fact, even if it is the *only* evidence adduced on an issue, is factually too weak alone to support it." The court sets aside the judgment if the evidence is so weak "as to be clearly wrong and unjust."

W. Wendell Hall & Ryan G. Anderson, *Standards of Review in Texas*, 50 St. Mary's L.J. 1099, 1134–35 (2019) (footnotes omitted).

And in applying either a legal-sufficiency review or a factual-sufficiency review, we must give deference to the credibility determinations of the trial court:

> In a bench trial, the trial court acts as the factfinder and is the sole judge of the credibility of witnesses. The trial court determines the weight of testimony, and it resolves conflicts and inconsistencies in the testimony. If the evidence is subject to reasonable disagreement, this court will not reverse the judgment of [the] trial court.

*S-G Owners Ass'n, Inc. v. Sifuentes*, 562 S.W.3d 614, 620 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (citations omitted).

We conduct our de novo review of the trial court's conclusions of law as legal questions. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). A conclusion may not be attacked on the grounds of evidentiary sufficiency. *Id.*

13

"However, the reviewing court may review the trial court's legal conclusions drawn from the facts to determine their correctness." *Id.* But an erroneous conclusion does not mandate reversal; if "the trial court rendered the proper judgment, the erroneous conclusion of law does not require reversal." *Id.*

## IV. Analysis

### A. Various factors complicate our review.

Our resolution of this appeal is complicated by the parties' presentations, both in the trial court and on appeal. We deal with findings of facts, some of which were apparently submitted based on what Pickel had hoped that the evidence had showed and which he now admits have no support in the evidence. Next, the findings of fact and conclusions of law reference causes of action upon which the trial court granted a directed verdict, and those rulings are not challenged on appeal. Then, we deal with the Lunas' arguments that rely on documentary evidence attached to a post-trial brief; the documents were not admitted during the trial and were apparently never considered as evidence by the trial court. Finally, we deal with the Lunas' brief that misstates the applicable standards of review.

14

**B.** **The evidence supports the trial court's findings that Cathy had agreed to assume the rent payments due while she occupied the store's location.**

In her Issue B(ii), Cathy challenges the trial court's finding on Pickel's breach-of-contract claim.[1]  After sorting through the distractions cataloged above, this appeal resolves itself simply:  Cathy agreed to make the lease payments.

The central finding of fact made by the trial court states,

> 5.  After the execution of the First Lease Amendment, Plaintiffs entered into an agreement with Defendants for Defendants to take over the Business, which included purchasing Plaintiffs' existing inventory and assuming the lease payments for the Leased Location until Defendants could secure a new lease with the Landlord, which Defendants represented to Plaintiffs they would do (the "Agreement").

Other findings of fact establish that the trial court found that an agreement existed and that the lease payments would be assumed.  These findings are as follows:

> 13.  After entering into the Agreement with Plaintiffs, one or both of the Defendants, Frank Luna and Cathy Luna, began making the lease payments required under the Lease.
>
> . . . .
>
> 30.  The Agreement between Plaintiffs and Defendants was for the sale of Plaintiffs' Business and was not limited to the purchase of inventory and include[d] Defendants' assumption of the Lease or signing of a superseding lease.
>
> . . . .

---

[1]We review this issue as to Cathy alone.  Pickel stated during trial that he was not suing Frank for breach of contract.

15

34. Defendants agreed to and acknowledged their obligations to make lease payments for the Lease Location, as evidenced by their payments to Landlord for a period of more than two (2) years.[2]

Though the trial court switched terms by first referencing the defined term "Agreement" in finding 5 and then referencing the capitalized but undefined term "Contract," it concluded that

5. Defendant Cathy Luna breached her Contract with the Plaintiffs by failing to fulfill the terms of the Lease, by failing to make monthly lease payments in full and through the end of the Lease term, and by taking inventory to the New Store.

The evidence is legally and factually sufficient to show that Cathy agreed to assume the payment of the rent under the lease for the store's location after she executed the APA and took occupancy. It is undisputed that Cathy had paid the rent after she and Frank had taken over the store's operation. Cathy acknowledged why she had paid the rent:

Q. Okay. Now, so you were paying the landlord in exchange for being able to run your business out of that space, right?

A. Yes.

Frank, who apparently had been delegated the responsibility of paying the rent, made similar concessions when the trial court asked him questions:

THE COURT: Did you, as the person running this business think that you needed to pay rent to the landlord in order to stay in that building?

---

[2]Issue A presented in the Lunas' brief is an attack on various findings made by the trial court but does not tie that attack to any particular cause of action. This leaves it to us to decide which findings might support a cause of action that warrants the judgment and then to determine whether those findings have evidentiary support.

16

THE WITNESS: Yes, sir.

THE COURT: Okay. And you did pay rent?

THE WITNESS: Yes, sir.

THE COURT: And at some point in time you stopped paying rent?

THE WITNESS: That's when we lost our license.

THE COURT: Okay. But you stopped paying rent, and you still had inventory in that building from April until December?

THE WITNESS: Yes, sir.

THE COURT: And you didn't pay some of the rent during that time?

THE WITNESS: Yes, sir.

THE COURT: Did you owe that rent?

THE WITNESS: Yes, we did.

THE COURT: Okay. You were occupying their building?

THE WITNESS: Right.

THE COURT: And you weren't paying rent?

THE WITNESS: Right.

And when rental payments were missed during Cathy's occupancy, Pickel testified that he had spoken to Frank and that Frank had stated that he would make up the missed payments. Frank confirmed that he had told Pickel that the missed payments would be made up:

Q. Did you ever make representations that you were going to make up the past[-]due rent?

A. That was not on the phone. I talked to him in person.

Q. So you said that in person, not on the phone?

A. Right.

We agree that the record lacks specific testimony from Pickel's side of the case regarding a specific agreement to pay rent. Obviously, a complicating factor in proving the nature of the agreement as to who would pay the rent was that Amanda, who had been the primary contact with the Lunas, had passed away before trial. Indeed, Pickel admitted that he had never spoken to Cathy before trial and could not state what she had agreed to. But a meeting of the minds to enter into a contract may be implied from the parties' conduct. *See Lucas v. Ryan*, No. 02-18-00053-CV, 2019 WL 2635561, at *17 (Tex. App.—Fort Worth June 27, 2019, no pet.) (mem. op.) (stating that "an implied-in-fact contract 'arises from the acts and conduct of the parties, it being implied from the facts and circumstances that there was a mutual intention to contract'" and that "[a]n implied-in-fact contract must include mutual assent through a meeting of the minds, but these requirements may be inferred from the parties' conduct and course of dealing"). In a legal-sufficiency review, the question is whether the evidence would enable a reasonable and fair-minded factfinder to reach the conclusion that Cathy undertook the obligation to pay the rent. The evidence shows that the answer to this question is yes. For a factual-sufficiency

18

review, we must decide whether the evidence supporting the trial court's finding is so weak that it is clearly wrong and unjust. The record shows that it is not.

### C. Cathy's efforts to avoid the effect of the concession that she had owed rent while occupying the store's location fail.

Cathy tries in a number of ways to sidestep the force of the concession that rent was owed and was paid either by her or by Frank. Some of her strategies are based on factual contentions and some on legal ones, but we conclude that none of them are persuasive. In summary, the contentions are as follows: (1) the absence of representations made by Cathy to Pickel; (2) the fact that the APA governing the purchase of the store's assets did not provide that Cathy would assume the lease; (3) claims that Amanda had breached her agreement to obtain a lease and a TABC license for Cathy; and (4) a claim that the statute of frauds bars enforcement of an agreement to pay rent even if one had been made. We will explain in turn why we reject each of the contentions.

First, as we noted above, finding 5's statement that there was an agreement to assume "the lease payments for the Leased Location until Defendants could secure a new lease with the Landlord" seems to be the core finding. The Lunas' attack on this finding is based on Pickel's failure to present a specific statement by the Lunas that Cathy would assume the lease:

> Unfortunately, this finding of fact is not supported by the record. In fact, as Appellant will point out many times during the course of this brief, Appellee testified that Appellant Cathy Luna never made any representations to him. Further still, while Appellee testified to multiple

19

conversations with Appellant Frank Luna, Appellee never once testified that Appellant Frank Luna [had] represented to him that he would secure a new lease from the Landlord. Not only that, the Asset Purchase Agreement contains no language indicating that Appellants were taking over the lease. . . . As such, the trial court's finding in this regard is not supported by the evidence.

Although finding 5 is not artfully drafted, the attack on it is an exercise in avoiding the forest for the trees. We must construe the findings to support the judgment. *See Nicholson*, 534 S.W.3d at 74. The finding's essence is an agreement that Cathy would make the rent payments under the existing lease. For the reasons that we have outlined, the acts of paying the rent and the acknowledgement that there was an obligation to do so supports a finding that the agreement existed.

We also agree that the APA does not contain a provision requiring lease payments. Though Pickel is careful in how he pitches his argument, we do not read his brief as actually contending that the APA established who would make payments on the lease. But that does not settle the issue because even the Lunas argue that there were side agreements not contained in the APA. Indeed, the Lunas conceded that matters involving the lease, such as the contingency that Amanda would obtain an assignment of the lease (and that she would obtain a license for Cathy from TABC), were not contained in the APA. Thus, the fact that the admittedly incomplete APA lacked a mention of who would pay the rent is not proof that conclusively rebuts the inference that an agreement to pay the rent existed.

With respect to the contingencies, Cathy relies on them as an excuse for not having made the rent payments. She claims that the contingencies created contractual duties that Amanda breached and thus excused Cathy's performance to make the rent payments.[3] However, the evidence relied on to establish the contingencies is not conclusive; in that circumstance, the determination of whether the contingencies existed is a fact question. Cathy waived the right to obtain a resolution of this factual question and thus waived her right to rely on the defense.

As we just noted, the Lunas conceded that the contingencies were not included in the written terms of the APA. Thus, the contingencies were based on an oral agreement—a contention that required the trial court to determine the credibility of the testimony that the contingencies existed. The Lunas' testimony—that the contingencies existed—presented a credibility question because they had a self-apparent motive to testify that the contingencies freed Cathy from the obligation to pay rent. Also, the testimony offered by Cathy regarding whether the payment of rent hinged on Amanda's performance of the contingencies was contradictory: Cathy indicated that she was obligated to pay rent because she ran her business out of the

_____

[3]The existence of the contingencies is the only challenge raised to certain of the findings that we referenced as supporting the judgment. With respect to finding 34—that the Lunas "agreed to and acknowledged their obligations to make lease payments for the Lease Location, as evidenced by their payments to Landlord for a period of more than two (2) years"—the Lunas limit their challenge to the claim that the "undisputed" evidence establishes that "[t]he entire agreement was contingent upon Amanda['s] helping with the TABC requirements and the Landlord['s] agreeing to transfer the lease." The same is true of finding 30—that the parties' agreement included an assumption of lease payments.

21

store's location, then she claimed that her obligation to pay rent had ended when the TABC license had lapsed, but then she acknowledged that she had continued to sell wine from the store's location even after the license had lapsed. Thus, the question of whether the contingencies existed as an oral agreement presented only a credibility question, which was a question for the trial court as factfinder to resolve. *See HealthTronics, Inc. v. Lisa Laser USA, Inc.*, 382 S.W.3d 567, 582 (Tex. App.—Austin 2012, no pet.) ("But if the uncontradicted evidence is unreasonable, incredible, or questionable because 'there are circumstances in evidence tending to discredit or impeach the testimony of the interested witness,' the testimony only raises a question of fact to be decided by the factfinder." (quoting *Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990))).

Procedurally, Cathy cannot rely on the contingencies as a defense because she waived her defense by failing to seek findings from the trial court dealing with the contingencies. Cathy relied on the contingencies as a breach of the agreement between the parties that excused the performance to pay the rent; this made the excuse an affirmative defense. *See Compass Bank v. MFP Fin. Servs., Inc.*, 152 S.W.3d 844, 852 (Tex. App.—Dallas 2005, pet. denied) ("[T]he contention that a party to a contract is excused from performance because of a prior material breach by the other contracting party is an affirmative defense that must be affirmatively pleaded."). No finding that refers to this defense was made in the trial court's findings. Thus, Cathy waived that affirmative defense by failing to request additional findings that address

that defense. *See Levine*, 884 S.W.2d at 796; *see also Orr v. Broussard*, 565 S.W.3d 415, 420 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (holding that party who failed to plead and obtain finding that other party's breach prevented performance waived issue).[4]

### D. The performance of the agreement to pay rent precluded Cathy's claim that the statute of frauds barred its enforcement.

The one affirmative defense that the Lunas did plead was the statute of frauds. The parties appear to concede that the statute of frauds would bar enforcement of an oral agreement to pay rent for the remaining term of the lease. Assuming that the statute of frauds would bar enforcement of an oral agreement to pay rent, we agree with Pickel that the partial performance of paying the rent removes the statute's effect.

The Dallas Court of Appeals described the parameters of the doctrine of partial performance as follows:

> Partial performance has been recognized as an equity-based exception to the statute of frauds. Under this exception, "an oral agreement that does

---

[4]The Lunas also note that the APA represents that "the Landlord fully consents to the transfer of the leasehold estate." They claim that this representation was false. We are unsure what they would have us make of this contention. Their occupancy of the location was never disturbed by the landlord, and they occupied the premises for almost the entire remaining term of the lease and vacated it only a month or two before the lease expired. Even if the landlord had at some point complained, it had waived any complaint about the Lunas' tenancy by accepting rent. *See Twelve Oaks Tower I, Ltd. v. Premier Allergy, Inc.*, 938 S.W.2d 102, 112 (Tex. App.—Houston [14th Dist.] 1996, no writ) (stating that "[a] lessor waives its right to forfeit a lease for a tenant's failure to obtain consent before assigning or subleasing if it accepts rents after the assignment or sublease").

not satisfy the traditional statute of frauds but that has been partially performed may be enforced if denying enforcement would itself amount to a fraud." The actions asserted to constitute partial performance must be "unequivocally referable" to the alleged oral agreement and corroborate the existence of that agreement; they "must be such as could have been done with no other design than to fulfill the particular agreement sought to be enforced."

*Stovall & Assocs., P.C. v. Hibbs Fin. Ctr., Ltd.*, 409 S.W.3d 790, 800 (Tex. App.—Dallas 2013, no pet.) (citations omitted).

*Stovall* went on to describe how the doctrine applies to a situation analogous to the one in this appeal—the efforts of a lessor to enforce an oral agreement for the lease of real estate:

> [T]he case before us involves a *lessor's* attempt to enforce an oral agreement for lease of real estate. In such circumstances, the partial performance exception to the statute of frauds has been applied to prevent application of the statute when the lessor fully performs and the lessee knowingly accepts the benefits of the oral agreement to lease and partly performs. *See, e.g., Carmack*[ *v. Beltway Dev. Co.*], 701 S.W.2d [37,] 40 [(Tex. App.—Dallas 1985, no writ)] (seller/lessor may be entitled to enforce oral agreement if it shows "performance of the contract by delivery of possession to the purchaser and a detrimental change of position for which the [vendor/lessor] has no adequate remedy[]"); *see also Newsom v. Newsom*, 378 S.W.2d 842, 844–45 (Tex. 1964) (lessor permitted to recover rent stipulated in oral lease for more than one year); *Tinsley v. Metzler*, 44 S.W.2d 820, 822 (Tex. Civ. App.—El Paso 1931, writ dism'd w.o.j.) ("[W]here the tenant has gone into possession and paid rent, this is such part performance as takes the transaction out of the operation of the statute [of frauds] and renders it unavailable as a defense" in an action for unpaid rent[]).

*Id.* at 801.

The facts we review are different than that of a lessor enforcing an oral lease against a lessee, but there is sufficient correspondence between our facts and the

24

principle for it to apply to the facts we review. The question is the same; whether the payment of rent provides sufficient proof of an agreement to pay that makes an oral agreement enforceable. Here, there is no question that the rent was paid. Further, though Cathy challenged whether their obligation to pay the rent had ended when Amanda's TABC license lapsed, Cathy acknowledged that occupancy of the store's location required payment of rent, and again, Pickel testified about Frank's promises made to pay the rent after the time that Cathy had claimed that her obligation had lapsed because the contingencies had not occurred. Thus, the facts about payment of the rent are "unequivocally referable" to the alleged oral agreement and corroborate the existence of that agreement; they are "such as could have been done with no other design than to fulfill the particular agreement sought to be enforced." *See id.* at 800. Also, though Pickel raises the issue of partial performance in his brief, the Lunas' reply brief does not challenge its application.[5]

---

[5]Appellants' Issues B(iii) and C assert that the evidence does not support a claim for fraud against Cathy and that the trial court made improper findings on the claim of unjust enrichment because the trial court had dismissed that claim and because Pickel had "presented no evidence to support" that claim.

With respect to a fraud claim against Cathy, Pickel's brief offers a confused discussion about a fraud finding against Cathy. The brief appears to concede that the trial court did not conclude that Cathy had committed fraud: "neither conclusion of law 4, nor any other conclusion states that Cathy Luna committed Fraud." It is understandable that the trial court would not find that Cathy had committed fraud because Pickel testified that Cathy had made no representation to him. Nothing in the findings indicates that the trial court was holding Cathy liable for allegedly fraudulent statements made by Frank. Thus, we do not address Issue B(iii), and our opinion does not rely on these causes of action as a basis to support the judgment.

Although the trial court did not make a finding specifically referencing the doctrine of partial performance, it did make a finding that appears to refer to the question of partial performance: "[The Lunas] agreed to and acknowledged their obligations to make lease payments for the Lease Location, as evidenced by their payments to Landlord for a period of more than two (2) years." Even if the trial court did not make an adequate finding on the question of partial performance, findings in support of the doctrine's application are implied. *See Bookout v. Bookout*, 165 S.W.3d 904, 908 (Tex. App.—Texarkana 2005, no pet.). As the Texarkana Court of Appeals has noted, issues of partial performance are imbedded in a breach-of-contract claim:

> Generally, the party claiming an exception to the statute of frauds must secure a finding to that effect. *Barbouti v. Munden*, 866 S.W.2d 288, 295 (Tex. App.—Houston [14th Dist.] 1993, writ denied)[, *disapproved on other grounds by Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998).] Here, partial performance was not submitted to the jury, and there was no request that the trial court make a finding on partial performance. Those failures would be fatal to [Appellee's] case unless a finding on partial performance is otherwise implied by law. We hold [that] such a finding is implied because (A)

---

The trial court also granted a directed verdict on the fraud claim against Frank, and Pickel does not challenge that ruling.

The same is true for Pickel's claim for quantum meruit. Pickel's brief appears to concede that the trial court made no finding on quantum meruit: "it is true that [Pickel] made no specific pleading of unjust enrichment, nor does [he] see Conclusion of Law number one as rewarding damages for Unjust Enrichment as a separately plead recovery." Thus, we do not address Issues B(iii) and C, and our opinion does not rely on these causes of action as a basis to support the judgment. *See* Tex. R. App. P. 47.1.

26

partial performance is necessarily referable to the Contract, and (B) there is sufficient evidence of partial performance.

*Id.* Thus, to the extent necessary, we imply the finding of partial performance.[6]

We overrule Cathy's Issue B(ii).

### E. We sustain Frank's challenge to the finding that he is liable to Pickel based on a cause of action for promissory estoppel.

The trial court entered judgment against Cathy and Frank, jointly and severally, for Pickel's damages. The only claim that a judgment against Frank could be predicated upon was promissory estoppel: Pickel acknowledged that he was not suing Frank for breach of contract, and the remaining claims against Frank were disposed of by directed verdict. In Issue B(i), Frank attacks the sufficiency of the evidence to support a claim for promissory estoppel.[7]

---

[6]Pickel's petition does not explicitly plead the doctrine of partial performance. The petition does allege performance by the payment of the rent due. Further, during trial, Pickel's counsel raised partial performance in response to the claim that Pickel's claim was barred by the statute of frauds. Pickel also relied on the doctrine of partial performance in his post-trial brief. At no point did the Lunas assert that Pickel had failed to plead the doctrine. "An issue is tried by consent when the record shows that both parties understood that the issue was part of the case and [that] the other party did not complain." *Aguirre v. Pompa*, No. 11-14-00168-CV, 2016 WL 2974817, at *2 (Tex. App.—Eastland May 19, 2016, no pet.) (mem. op.). In *Aguirre*, the Eastland Court of Appeals concluded that the issue of partial performance had been tried by consent. *Id.* In that case, during a bench trial, counsel raised the doctrine to counter a statute-of-frauds defense and noted the evidence that established partial performance. *Id.* Opposing counsel made no objection to the trial court's consideration of the issue. *Id.* In those circumstances, the issue was tried by consent. *Id.* The same dynamic applies in this case, and we conclude that the issue was tried by consent.

[7]Pickel's promissory-estoppel claim is apparently based on statements only made by Frank as Pickel testified that he had never spoken to Cathy before trial. To

27

Pickel states that he asserted a promissory-estoppel claim to avoid the statute-of-frauds defense.[8] He also concedes that the trial court's findings about the "promise" allegedly made by Frank and that are the basis of the promissory-estoppel claim are not supported by the record.[9] Due to Pickel's concession—that the trial

the extent that any recovery against Cathy is also based on promissory estoppel, our reasoning—holding that the claim against Frank is not valid on that theory—would apply to Cathy. We need not reach Cathy's liability under this theory because we hold that she is liable for breach of contract.

[8]"The requisites of promissory estoppel in Texas are[] (1) a promise[,] (2) foreseeability of reliance thereon by the promisor[,] and (3) substantial reliance by the promisees to their detriment." *Wade v. XTO Energy Inc.*, No. 02-12-00007-CV, 2013 WL 257361, at *6 (Tex. App.—Fort Worth Jan. 24, 2013, no pet.) (mem. op.) (citing *English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983)).

[9]The findings that Pickel concedes are not supported by the record are findings 18 and 20. But these findings were part of the package of findings that the trial court apparently made in support of the promissory-estoppel claim, and the other findings are tied to findings 18 and 20:

18. At that time, Plaintiffs contacted Defendants regarding the default. At that time, Defendant Frank Luna represented that Defendants were only $10,000.00 in arrears, a statement that was false.

19. At the time Defendant Luna made *this representation*, Defendant Luna[] (1) knew that these representations were false, or (2) made the representations recklessly, as positive assertion, and without knowledge of their truth.

20. Defendant Luna further represented that Defendants would be making up the alleged $10,000.00 arrearage in two payments of $5,000.00 over the next two weeks. This statement was also false.

21. At the time Defendant Luna made *this representation*, Defendant Luna[] (1) knew that these representations were false, or (2) made the

court's findings, which he argues underlie the promissory-estoppel claim, are not supported by the record—we cannot uphold a judgment against Frank based on a cause of action for promissory estoppel.

Pickel makes efforts to sidestep the effect of his concession, but they are of no avail. In essence, he asks us to ignore the absence of evidence supporting the findings that were made and rely on other evidence that he contends the record contains that supports his promissory-estoppel claim. In other words, Pickel argues that—after the trial court entered findings to support his promissory-estoppel claim that he concedes are not supported by the evidence and for which he took no step in the trial court to correct—we, as an appellate court, should step in and make the findings that support this recovery. Pickel has waived the right to obtain findings to support his promissory-estoppel claim, and we have no power to make the factual findings that he wishes the trial court had made.

---

representations recklessly, as positive assertion, and without knowledge of their truth.

22. Plaintiffs detrimentally relied on *these false material representations*.

23. Plaintiffs relied on their dealings with one or both of Defendants in the sale, Defendants' representations that they would make the lease payments, as well as Defendants['] history of making payments under the terms of the Lease, and as such, Plaintiffs did not seek anyone else to take over the Lease, nor did they try to re-assume the Lease themselves.

24. The Defendants made *the representations* with the intent that the Plaintiffs delay taking action to reassume or take over the Lease. [Emphases added.]

First, if the trial court made a finding that Pickel thought was incorrect, it was his burden to bring this defect to the trial court's attention under Texas Rule of Civil Procedure 298; by failing to do so, he waived his right to obtain the correct finding. *See Chatterjee v. Banerjea*, No. 05-18-01035-CV, 2019 WL 3886655, at *4 (Tex. App.—Dallas Aug. 19, 2019, no pet.) (mem. op.) ("Failing to request amended or additional findings of fact or conclusions of law, however, waives the right to complain on appeal about the initial findings and conclusions.").

To remedy this misstep, Pickel asks us to independently make fact findings that the record establishes that Frank made a representation. This we cannot do because we do not have the power to find facts. *See Zeptner v. Zeptner*, 111 S.W.3d 727, 734 (Tex. App.—Fort Worth 2003, no pet.) (op. on reh'g) ("A court of appeals cannot make findings of fact; it can only 'unfind' facts." (quoting *Tex. Nat'l Bank v. Karnes*, 717 S.W.2d 901, 903 (Tex. 1986))).

Although Pickel's argument might offer some sanctuary if the facts about whether Frank had made a particular representation were undisputed, no such evidence exists. *See Limbaugh v. Limbaugh*, 71 S.W.3d 1, 5 (Tex. App.—Waco 2002, no pet.) ("A court need not make findings of fact on undisputed matters.").

Specifically, Pickel apparently argues that representations about the assumption of rent were made in the APA, and if we interpret the argument correctly, Frank should be liable for representations in the APA (even though he did not sign it) because he was Cathy's "de facto partner." In Pickel's view, "there should be no

30

question but that [he] was entitled and justified in relying on the entire premise of the APA, with all of its addenda and attachments incorporated by virtue of section 2.2 (b), which was that at least Cathy Luna was buying their business[] and taking over the lease on the location." Whatever its premise, the APA does not address who will assume payment of the rent on the lease. Thus, there is no basis to claim that the APA contained a representation about who would make the rent payments. Indeed, it was the absence of this term from the APA that complicated Pickel's claim. Beyond this, Pickel made no claim based on a "de facto partnership" in the trial court.

Pickel's argument then pivots to the testimony where Frank conceded that he had spoken to Pickel at some point and had said that he was "going to make up the past[-]due rent." Pickel argues that this is proof that Frank made a representation that forestalled Pickel from locking out the Lunas and taking possession of the store's inventory to recoup the unpaid rent. But there was more than one conversation during which Frank allegedly told Pickel that the rent would be caught up. Some of these conversations occurred months before the December 2015 conversation that Pickel claims he relied on, and the rent was made up after the earlier conversations had occurred. It is unclear where in the testimony Frank acknowledged that he had spoken to Pickel and to which conversation he was referring. The only other evidence that the December 2015 conversation had occurred was the testimony of Pickel as an interested witness, which presented a fact question. Thus, there is no conclusive proof that Frank conceded that he had made the promise that Pickel uses

as a predicate for his promissory-estoppel claim. We are simply not in a position to step in and make a finding that Pickel wishes that he had obtained in lieu of the erroneous one that the trial court made.

The findings made by the trial court to support a claim of promissory estoppel are not supported by legally sufficient evidence, as Pickel concedes. We cannot make the finding that Pickel now seeks. We sustain Frank's Issue B(i) and hold that the recovery against Frank cannot be supported on the basis of the promissory-estoppel claim made against him.

## F.    There is sufficient evidence to support the trial court's damage award.

In her Issue D, Cathy attacks the trial court's damage finding by arguing that it is speculative and is undermined by documents that are attached to a post-trial motion. As explained below, the evidence supports the trial court's damage award.

The trial court awarded Pickel $40,000 in damages, plus attorney's fees.[10] The evidence that Pickel relied on to establish his damages is straightforward. The landlord sued him for unpaid rent on the location, and in settlement of the suit, he paid the $40,000. Not only did Pickel testify to why he had paid the landlord this amount, but there was also a settlement agreement that he and Amanda had entered into with the landlord after the lease had expired. That agreement, which was

---

[10]The trial court's damage finding states, "41. As a result of Defendants['] failing to make the Lease payments as agreed, in or around June 2017, Plaintiffs paid the Landlord the sum of $40,000.00 for the full settlement of all claims against them under the terms of the Lease."

introduced into evidence, references the lease on the location, states that "Landlord contends Tenants breached the Lease by failing to pay rent," and provides for payment of $40,000 in settlement of the claims made by the landlord. It is a reasonable inference that the missed rental payments occurred after Cathy had taken occupancy of the location and had assumed responsibility for the payments because at one point during that period, the lease payments were current, and in fact the landlord owed a small credit balance. Nor did the responsibility for paying the rent apparently ever shift back to Pickel and Amanda; Cathy occupied the location until almost the end of the lease's term because the evidence shows that the Lunas moved out of the location as late as January 2016 and that the lease terminated the following month.

Cathy points to several matters in the record to counter the straightforward conclusion that Pickel had paid the landlord the payment that she had failed to pay. First, she repeatedly points to checks that were attached to her post-trial brief and claims that the checks reflect payments to the landlord that Pickel did not credit.[11] The reference to documents not introduced at trial is one of the factors that we have already mentioned as needlessly complicating our review of this appeal. Documents not introduced at trial are not part of the record that we may consider on appeal; "[o]ur duty, as an appellate court, is to consider only the testimony adduced and the evidence tendered and/or admitted at the time of trial." *Vanscot Concrete Co. v. Bailey*,

---

[11]Cathy's brief includes a chart setting out these payments.

33

862 S.W.2d 781, 783 (Tex. App.—Fort Worth 1993), *aff'd*, 894 S.W.2d 757 (Tex. 1995).[12]

Cathy then points out that the letter sent by the landlord in December 2015 referenced only a missed payment totaling slightly more than $30,000. But the letter in question was sent a couple of months before the lease expired. Thus, the letter did not include payments that were not made between the time it was written and the time that the lease expired. As Pickel testified that he had to pay $40,000 for the missed payments, the discrepancy between the earlier amount and the amount actually paid is not sufficient to undermine a finding that Pickel's damage claim was an accurate calculation of the payments that Cathy had failed to make.

Cathy also claims that we must review the award by determining whether the evidence "conclusively" supports the amount awarded and that "the evidence must

---

[12]The Lunas' motion referenced Texas Rule of Civil Procedure 270, which allows a trial court to permit additional testimony to be offered. *See* Tex. R. Civ. P. 270. There is no indication that the Lunas actually presented a motion under Rule 270 to the trial court or that it ruled on such a motion. To the extent that the Lunas claim that the trial court should have permitted additional testimony, they have failed to preserve error on that claim. *See* Tex. R. App. P. 33.1(a) (requiring timely objection and ruling to preserve error).

Pickel has filed a motion to strike the Lunas' post-trial evidence, seeking an order striking the copies of the checks and associated materials attached to the Lunas' post-trial brief. These materials are also attached as an appendix to the Lunas' amended brief. The motion also seeks to strike the argument contained in the Lunas' amended brief referencing the materials. We have stated that we do not consider the materials to be part of the appellate record in this case and do not consider them in disposing of this appeal. However, we deny Pickel's motion to order the materials and the arguments actually stricken from the Lunas' filings.

leave 'no room for ordinary minds to differ as to the conclusion to be drawn from it.'" This argument flips the standard because it relies on cases that state the standard of review for an evidentiary challenge made by a party that carried the burden of proof in the trial court.[13] Instead, Cathy challenges an issue where her opponent had the burden. The legal-sufficiency standard in that circumstance is that "the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *See Graham Cent. Station, Inc.*, 442 S.W.3d at 263. The factual-sufficiency standard asks if the evidence supporting the finding is so weak that it is clearly wrong and unjust. *See* Hall & Anderson, *supra*, at 1134–35. Again, Pickel's evidence was in essence that he had paid what Cathy had contracted to pay but did not. A fair-minded person could reach the same conclusion that was made by the trial court, and it is not so weak that it is clearly wrong and unjust. The evidence that Cathy cites does not challenge this conclusion. The inconsistency between the amount paid by

---

[13]Cathy's brief cites two Texas Supreme Court cases for the proposition that the evidence of damages must be conclusive. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.*, 644 S.W.2d 443, 446 (Tex. 1982). The Texas Supreme Court itself notes that the standard derived from these cases deals with review of evidentiary challenges by the party bearing the burden of proof on the attacked issue:

> Because Lufkin bore the burden of proof on that issue, it must demonstrate on appeal that the evidence conclusively established the fact of damages as a matter of law. *See Dow Chem. Co.* . . . , 46 S.W.3d [at] 241 . . . . To conclusively establish that fact, the evidence must leave "no room for ordinary minds to differ as to the conclusion to be drawn from it." *Triton Oil & Gas Corp.* . . . , 644 S.W.2d [at] 446 . . . .

*Int'l Bus. Machs. Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 235 (Tex. 2019).

Pickel and the award due in the December letter sent by the landlord does not undermine the damage finding because apparently unpaid rent continued to accrue after the letter was written. Further, the primary source of the evidence that Cathy relies on to challenge it is not something that we can consider as she did not introduce it at trial.

We conclude that the trial court's damage award conformed to the applicable measure of damages and is supported by legally and factually sufficient evidence. The overarching goal of damages in a breach-of-contract action is to "provide just compensation for any loss or damage actually sustained as a result of the breach." *Parkway Dental Assocs., P.A. v. Ho & Huang Props., L.P.*, 391 S.W.3d 596, 607 (Tex. App.—Houston [14th Dist.] 2012, no pet.). That goal is usually accomplished with an expectancy or benefit-of-the-bargain measure of damages that "restore[s] the injured party to the economic position it would have occupied had the contract been performed." *Id.* Here, Pickel's damages seek this measure; he sought the damages that he claimed had resulted from the failure to pay the landlord the rent that was owed on the space.

We overrule Cathy's Issue D. And based on our analysis in this section, as well as our breach-of-contract analysis above, we also overrule Cathy's Issue A challenging the findings that support the conclusion that she had breached a contract and that support the trial court's damage award.

36

## V.  Conclusion

Having overruled Cathy's Issues A, B(ii), and D, which are dispositive of her appeal, we affirm the trial court's amended judgment on the breach-of-contract claim and the damage award against Cathy.  But having sustained Frank's dispositive Issue B(i) that Pickel take nothing on his claims against Frank based on promissory estoppel, which is the only cause of action that Pickel asserted against Frank that is still viable on appeal, we reverse the trial court's amended judgment as to Frank and render judgment that Pickel take nothing as to Frank.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered:  October 8, 2020

37